960 P.2d 1227

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Carl Irvin RICHIE, Defendant–Appellant**

**No. 19934.**

Supreme Court of Hawai'i.

June 25, 1998.

As Amended Aug. 3, 1998.

---

Daphne E. Barbee, on the briefs, for defendant-appellant.

Erick T.S. Moon, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

Ricky R. Damerville, Deputy Attorney General, on the briefs, for Amicus Curiae State of Hawai'i.

David A. Johnson, on the briefs, for Amicus Curiae American Civil Liberties Union.

Before KLEIN, Acting C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and BLONDIN, Circuit Judge , in place of MOON, C.J., Recused.

RAMIL, Justice.

Defendant–Appellant Carl Irvin Richie appeals from the judgment convicting him of promoting prostitution in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1203 (1993), and unlawful ownership or operation of business, in violation of HRS § 842–2(2) (1993).[1] For the following reasons, we affirm Richie's conviction of promoting prostitution in the second degree, but we reverse his conviction of unlawful ownership or operation of business.

## I. BACKGROUND

Testimony at trial revealed the following. Officer Alfredo Villanueva, an undercover officer with the Vice Division, Morals Detail, of the Honolulu Police Department (HPD) testified that he came to the island of Kauai on September 15, 1996 to assist the Kauai Police Department (KPD) in a prostitution investigation. Officer Villanueva and his partner, Officer Jensen Okagawa, were to pose as construction contractors who had just finished a job and were having a bachelor party.

On the night of September 16, 1995, the two officers set up their operation in a condominium. In addition to the two officers, four construction workers were present. At approximately 8:05 p.m., Richie arrived at the condominium and handed Officer Villanueva a written contract. The contract provided for three women to perform for one hour in return for $750. The officer paid Richie the $750. Richie then brought up his stereo equipment and three women: Monica Alves (introduced as "Monique"), Riaana Hernandez (introduced as "Celeste"), and Fania Hicks (introduced as "Baby Bear"). A fourth female, Tina Silva, assisted Richie.

Richie started the music and the women came out of the bedroom where they had been changing. The women were dressed in negligees, and as they danced around the

---

1. HRS ch. 842 is Hawaii's version of the federal Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. ch. 96. References to "RICO" in this opinion may apply to either the federal statute or the Hawai'i statute depending upon the circumstances.

room, they began taking their clothes off. The first person to approach Officer Villanueva was Alves. The officer testified:

[OFFICER VILLANUEVA:] A. She was on her hands and knees and she was crawling towards me like a cat, licking her lips. Then when she got up to me—I was seated on a chair and I had my legs spread, and she came up between my legs and she cupped her breasts and she squeezed them together and had my crotch—right around my crotch area.

[PROSECUTOR:] Q. Okay. So at first— okay. At that time when she rubbed her breasts on your crotch area, what do you mean? What area is this?

A. My penis area.

Q. And you had your shorts on?

A. Yes.

Q. And what about her breasts? Were they bare or did she have a bra on?

A. They were bare.

Q. And her bare breasts came in contact with your crotch area, your penis?

A. Yes.

Q. Okay. This would be through the clothing?

A. Yes.

. . . .

Q. . . . What happened next?

A. I gave her a tip which she took between her breasts.

Q. Now before you gave her the tip, was there any eye contact?

A. Yes. She looked at me and then I had a lot of currency in my hand and she looked at my—my hand where I had the currency. She looked at it and I—I took that as to indicate to give her a tip so I gave her a tip.

Q. And where did you place the five dollars?

A. Between her breasts.

Q. And when you did this, what did she do?

A. She crawled up and then sat on my lap.

Q. And what was she wearing as far as her bottom when she sat on your lap at this point in time?

A. She had a garter belt and stocking and also panties.

Q. So she sat on your lap wearing those clothing, and what—what did she do?

A. Then she pulled her panties to the side, exposed her vagina and then she started to gyrate on my lap, rubbing her vagina on my crotch area.

Q. Okay. So now she's rubbing her vagina on your crotch area. Did it simulate any type of activity?

A. It simulated some type of intercourse.

Q. Would this be sexual intercourse?

A. Yes.

Q. Okay. So—and after she did that, rubbing her vagina on your crotch area, what—what happened?

A. I gave her another tip and then she went around to another guy.

. . . .

Q. Okay. Did—when the contact was occurring between Monica and yourself, did the defendant stop Monica from doing what she was doing to you?

A. No.

Q. What was he doing if he wasn't stopping her?

A. He was just encouraging, just to get wild and, you know, just to—keep dancing.

Q. Okay. Now let's talk about the other dancer that was dancing in the room, [Riaana] Hernandez?

A. Yes.

Q. Do you recall an incident or incidences with her that—

A. She was next—she was the second female that came to me after Monica left and she started dancing in front of me first and then she turned around and squat— squatted down on my crotch area and she started to simulate intercourse.

Q. She started to simulate sexual intercourse with you?

A. Yes, as she sat on my lap facing her back to me.

Q. Then what happened next?

A. Then she got up and she pulled her panties to the side and I gave her a tip.

Q. How much money did you give her?

A. Five dollars.

Q. Now after you gave her the five dollars, gave her the tip, what happened, what was her response?

A. Well, she turned around, faced me. The she started rubbing her vagina and—through her panties and then she grabbed my crotch area with her left hand.

Q. So she grabbed herself—she grabbed her vagina and she grabbed your penis?

A. Yes.

. . . .

Q. Now what about—do you recall Fania, what Fania was doing?

A. Yeah. When Hernandez left, Hicks came up and she started dancing in front of me. Then she pulled her, you know, she was licking her lips, she was rubbing her breasts. Then she pulled her panties to the side and exposed her vagina to me and I gave her a tip. After I gave her a tip on her garter belt, she grabbed my crotch area and rubbed my crotch.

Q. And this is after your gave her the five dollars?

A. Yes.

Q. Now when she grabbed your crotch, she rubbed it, and did you do anything with your money?

A. I—after I gave her that one tip, I put my money away.

Q. And then what happened?

A. She left.

Q. Now you just described what [Riaana] and Fania, how they danced on you and what they did. And during this time when this was occurring, was the defendant playing music—music in the same location?

A. Yes, he was.

Q. And was he facing towards you during that time?

A. Yes.

Q. Okay. Now did the—did the defendant—did he stop [Riaana] from simulat-ing sexual intercourse on top of you and grabbing your penis?

A. No, at no time did he stop the—stop the dancing.

Q. And when Fania grabbed your crotch with her hand after you gave her the five dollars, did this defendant stop her from doing that?

A. No, he didn't.

Q. If he wasn't stopping [Riaana] and Fania from doing this to you, what was he doing?

A. He just kept playing the music and he was just, you know, encouraging the girls to get wild.

Q. Now was a lot of tipping going on?

A. Yes.

Q. And then who was—who was collecting the tips?

A. Well, the girls were collecting at first and then like if their garter belts got full of currency, they'd take it off and they threw it on the couch next to Silva or they would hand it directly to Silva.

Q. Okay. And then what did you observe Tina Silva doing with the money that she was receiving from the dancers?

A. She was counting them and putting them together and then she'd, like, take some of it, roll it up and place it in her dress, on her left breast area, and then she gave the rest to Richie, which he took and then placed into his briefcase that he had at his feet.

Q. So then the defendant was keeping some of the tips that were given to the dancers?

A. Yes.

During a break between dancing sessions, Officer Villanueva approached Richie and conversed with him:

[PROSECUTOR:] Q. Okay. So you approached the defendant and what happened?

[OFFICER VILLANUEVA:] A. I told him that my partner was interested in one of the girls, and he asked me which one and I told him that—described her and I said I think that she was introduced as Monique.

Q. Okay. And you said that he was interested in one of the girls?

A. Yes.

Q. And what else?

A. I told him that—well, he asked me what they wanted to do and I asked him if they could disappear for a little while, that he wanted to have sex with her in the bedroom.

Q. And did you use any other terms to show your intention as far as what sex meant?

A. Yes. I told him that he wanted to fuck 'em in the bedroom the first chance he gets.

Q. And what was the defendant's response to you saying that your partner wanted sex and you wanted to fuck?

A. I turned around and looked at my partner and smiled at him. Then he turned his back to me and he told me that it's going to cost me extra 225 and I asked him, is this two hundred twenty-five; he said yeah.

Q. When this conversation was going on between yourself and the defendant, where was your partner Okagawa?

A. At first he was still seated on the loveseat and then he approached our location.

Q. And then when you confirmed that it was going to be $225 for the sex later on, what happened?

A. Officer Okagawa also told him, yeah, that he was interested in Monique and he wanted to have sex with her.

Q. And what was the defendant's response?

A. That's when he told us that it'd have to be after the performance and it had to be a private showing.

Q. Then—then what happened next after he told you it would have to be private showing?

A. Then he said that he was going to set the second phase of the performance.

At the end of the performance, the officers gave a prearranged signal over the listening devices they were wearing. Then, KPD officers entered the condominium and arrested Richie and the four women.[2]

The prosecution also called HPD undercover officer Jensen Okagawa as a witness. Officer Okagawa testified regarding his own experiences at the party on September 16, 1995:

[PROSECUTOR:] Q. Uh, could you—could you please describe one of the instances where Monica may have danced in front of you, or for you?

[OFFICER OKAGAWA:] A. In this—in this, um, point in her routine, uh, she was completely naked and she had sat on my lap with her back facing towards me and, uh, she started grinding her vagina on to the crotch of my pants, simulating sexual intercourse and then, uh, she leaned back on to my chest and then grabbed both my hands and placed them on her breasts and—

Q. Those were her bare breasts?

A. Yes, it was.

Q. And you could feel her simulating sexual intercourse on top of your crotch area?

A. Yes, I did.

. . . .

Q. . . . . [A]nd this would be on top of your penis?

A. That's correct.

Q. And your could feel her on top of you?

A. Yes, I could.

Q. And so she was the one that put your hands on top of her?

A. That's correct, when she leaned back on to my chest she grabbed my hands and then, you know, put them on top of her breasts.

Q. And then—then, um, did you give her any money at that time?

A. No, I remember—I removed my hands but then she grabbed it again.

2. Charges against the four women were later dismissed in return for their agreement to testify truthfully in Richie's trial. However, none of the four women was actually called as a witness at trial in this case.

Q. So she let you touch her breasts a second time?

A. That's correct.

Q. And then what happened?

A. And then, uh, she indicated to me to give her money.

Q. And how did she indicate to you to give her money?

A. She stopped her—well, she stopped, you know, just her actions, she stopped, she looks at you and she smiles and that—that indicates that, you know, she wants money, so then I gave her a five dollar.

Q. How did you give her the—the five dollar—five dollars?

A. Well, I—I handed it to her like this, but then she stood up, she turned around and then she cupped her breasts and then—and then she squeezed them together in between my hands and she took the money that way.

. . . .

Q. When—at this point in time, as you described Monica having this contact with you, where she grabbed your hands and placed them on her breasts, how far away was the defendant from you?

A. To my left, um, where he—where he was, about two or three feet away.

Q. Okay. Was anything blocking your view from him?

A. I don't think so. He was standing up and I was—

Q. Right there?

A. Right there.

Q. And did he stop Monica from having you have contact with her breasts?

A. Not once.

Q. Not the first time, not the second time?

A. He never—he never stopped it at all.

Q. Okay.

And the fact that he didn't stop Monica from doing what she did to you, what was he doing?

A. I remember, you know, him keep saying, uh, you know, let's get wild here, you know.

. . . .

Q. Okay. What about [Riaana] Hernandez, what do you remember about her?

A. Uh, [Riaana] Hernandez, uh, when she approached me, she too was completely naked in this—in this stage of her performance and like I said, I was sitting on a, like a love seat so she stood up on the love seat and she had put one leg on the arm rest and the other leg on the seat next to me and so she stood above me and, um, you know, she did her—her dance or what was and then, uh, she indicated me to—to give her money, so I gave her a five dollar—a five dollar bill and then she—she lowered her vagina on to the top of my head and she started rubbing it back and forth.

Q. So she rubbed her vagina on the top of your head back and forth?

A. That's correct.

Q. And when this is occurring, the defendant was still right there in your presence?

A. That's correct.

Q. You were able to see him clearly?

A. I could see him clearly.

Q. You could almost touch him?

A. Just about.

Q. And um, did he stop [Riaana] from grinding her vagina on your head?

A. No, he didn't.

Q. Did he stop her from climbing up on the couch and coming up over you?

A. No, he didn't.

Q. Well, if he didn't stop it did he encourage it in any way?

A. Well, like I said, he kept saying, you know, um, let's get wild, things are gonna get wilder, to that nature.

. . . .

Q. What about the dancing of [Fania] Hicks, do you recall her dancing or performing in front of you?

A. I do.

Q. What do you remember?

A. Um, she was also completely naked in this—in this stage and, uh, I gave her a one dollar, she lifted up her [garter] belt

during her—her dance, I gave her a dollar bill and then she sat on my lap, uh, again with her back facing towards me and she grinding her vagina on the crotch of my pants and again simulating the act of sexual intercourse. And then, uh, she turned to me, she smiled and she lifted up her [garter] belt indicating to me to give her more money, so I took out another dollar bill and then she just turned around and she again squeezed her breasts, you know, between my hand and took the money that way.

Q. And you said that she grinded her naked vagina onto your crotch area, um, and did you feel her on top of your penis?

A. I did.

Q. And was the defendant still close to you when this was occurring?

A. He was the same place, to the left of me.

Q. And did he stop [Fania] Hicks from—from her conduct?

A. No, he didn't. He didn't.

Q. Did he encourage it in any way?

A. Um, again just by constantly saying, you know, things are gonna get wild here, uh, let's get wild.

. . . .

A. Um, as the girls were dancing and—and circling all of us, uh, when the girls got, you know, a lot of money they would walk over to Tina Silva and drop the money on the couch and then she would just go ahead and—and she would count it and she put like a portion, uh, in her dress and then she—she walked over and gave the rest to the defendant, and then the defendant put it in his briefcase.

Officer Okagawa also testified that during the break between sessions, he observed Officer Villanueva approach Richie and converse with him. Officer Okagawa then went over to the two men. During the conversation, Officer Okagawa pointed to Alves:

[PROSECUTOR:] Q. You—you—you pointed to Monica, then you told the defendant you wanted her?

[OFFICER OKAGAWA:] A. That's correct.

Q. And did you tell her—tell him for what purpose?

A. No, but, um, Officer Villanueva, um, you know, was telling the defendant that, you know, I was shy and he's saying are you sure that I can fuck her.

Q. And did you come in and confirm this?

A. Yeah, I just said, oh, I can fuck, and he said yeah. But then—

Q. So you used the word fuck?

A. Yes.

Q. And you said it directly to the defendant?

A. Directly to the defendant.

Q. And his response was yes?

A. Well, he said take it—take it as a private dance.

Q. And did—was there any agreement as to how much money it would cost you for this additional service?

A. Yes.

Q. How much money would it cost you?

A. It would be two hundred twenty five dollars that Officer Villanueva would pay, because, you know, he was the one who was supposedly taking care of me and stuff. So, you know, Officer Villanueva said he would pay for it and not to worry because he would take good care of me.

. . . .

Q. Okay.

Now, you've already pointed out that you wanted to have Monica for two twenty five afterwards?

A. Uh-huh.

Q. Have sex with her?

A. That's correct.

Q. And what happens next?

A. I asked the defendant when, he just said after the second set, so I just agreed.

Q. And then how did the conversation end?

A. Well, it's—um, it just ended.

Later, when Officer Okagawa was cross-examined about the conversation with Richie, the following exchange occurred:

[DEFENSE COUNSEL:] Q. You—you said earlier—

. . . .

Q. —he said he—you could fuck her?

[OFFICER OKAGAWA:] A. Yeah, he agreed when I asked if I could fuck Alves.

Q. He agreed?

A. Right.

Q. Through telepathy?

A. No.

Q. Oh, what word did he use?

A. Exact quote I—I can't give you an exact quote but he answered in the affirmative. If you're asking me if he said yes, yeah, hmm, exact quote I cannot give you, but he answered me in the affirmative.

The prosecution also called KPD Officer Gerald Kim as a witness. Officer Kim testified that during his investigation of Richie's business, Fanta–See Express, he recovered billing records for advertisements placed in the Kauai Shopper and KONG Radio. He also testified that Richie had applied for and received a general excise tax license in his name doing business as Fanta–See Express. Officer Kim also recovered a number of documents entitled "entertainer independent contractor contract" and "application for employment" that had been completed by the dancers. Moreover, Officer Kim testified that he recovered eighty completed client contracts similar to the contract executed on September 16, 1995. According to the officer, the client contracts indicated that, between March and September 1995, Richie had conducted eighty performances and received a total of $17,810 from those performances. The above documents were either formally entered into evidence or entered by stipulation. In addition, a number of photographs of dancers in various positions and states of undress were entered into evidence.

These photographs were obtained from Richie's home and briefcase. The prosecution also entered into evidence a videotape taken shortly after KPD officers entered the condominium.

On February 9, 1996, the jury found Richie guilty of promoting prostitution in the second degree and unlawful ownership or operation of business. Richie was sentenced to concurrent terms of five years imprisonment and ten years imprisonment, respectively. Following entry of judgment on May 22, 1996, Richie filed a timely notice of appeal.

## II. *DISCUSSION*

### A. *Whether Richie's Conviction of Promoting Prostitution in the Second Degree Should Be Reversed*

#### 1. *The Applicable Statutes*

Before addressing Richie's arguments, it is necessary to examine the applicable statutes. HRS § 712–1203 (1993) provides in relevant part:

> **Promoting prostitution in the second degree.** (1) A person commits the offense of promoting prostitution in the second degree if the person knowingly:
>
> (a) Advances or profits from prostitution[3] by managing, supervising, controlling, or owning, either alone or in association with others, a house of prostitution or a prostitution business or enterprise involving prostitution activity by two or more prostitutes[.]

It is clear that the definition of promoting prostitution in the second degree incorporates the concept of "prostitution." "Prostitution" is a separate offense defined in HRS

---

3. HRS § 712–1201 (1993) provides:

**Promoting prostitution; definition of terms.** In sections 712–1202, 712–1203, and 712–1204:

(1) A person "advances prostitution" if, acting other than as a prostitute or a patron of a prostitute, he knowingly causes or aids a person to commit or engage in prostitution, procures or solicits patrons for prostitution, provides persons for prostitution purposes, permits premises to be regularly used for prostitution purposes, operates or assists in the operation of a house of prostitution or a prostitution enterprise, or engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.

(2) A person "profits from prostitution" if, acting other than as a prostitute receiving compensation for personally-rendered prostitution services, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of prostitution activity.

§ 712–1200 (1993), which provides in relevant part:

> **Prostitution.** (1) A person commits the offense of prostitution if the person engages in, or agrees or offers to engage in, sexual conduct with another person for a fee.
>
> (2) As used in subsection (1), "sexual conduct" means "sexual penetration," "deviate sexual intercourse," or "sexual contact," as those terms are defined in section 707–700.

Prostitution, therefore, requires "sexual conduct," and "sexual conduct" expressly includes "sexual contact," as defined in HRS § 707–700. HRS § 707–700 (1993) provides in relevant part:

> "Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.[4]

Thus, by the plain meaning of HRS §§ 712–1200 and 707–700, touching the sexual or other intimate parts of another person, for a fee, constitutes prostitution, *even if the touching occurs through clothing.* "It is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997) (quoting *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044–45 (1994)). Clearly, prostitution under HRS § 712–1200 encompasses touching through clothing. Consequently, promoting prostitution in the second degree under HRS § 712–1203 includes advancing or profiting from prostitution by controlling a prostitution business or enterprise where the alleged prostitution involves touching through clothing for a fee.

Amicus Curiae State of Hawai'i, as represented by the Department of the Attorney General, notes that the broad definition of "sexual contact" in HRS § 707–700 was specifically enacted in response to a decision of this court. In *State v. Rodgers,* 68 Haw. 438, 718 P.2d 275 (1986), we held that the touching of breasts through clothing did not constitute "sexual contact" under the original version of HRS § 707–700. *Id.* at 444, 718 P.2d at 278. In response, the legislature amended HRS § 707–700 to include touching through clothing. *See* 1987 Haw. Sess. L. Act 181, § 7, at 410; Hse. Stand Comm. Rep. No. 691, in 1987 House Journal, at 1434. Thus, even if there were any ambiguity in the definition of "sexual contact," the history of the statute indicates that the legislature specifically intended to prohibit touching through clothing.

Amicus Curiae American Civil Liberties Union (ACLU) notes that the definition of "sexual contact" in HRS § 707–700 is located in a different chapter of the Hawai'i Penal Code than prostitution. The ACLU, therefore, argues that the definition should be limited to the sexual offenses found in HRS ch. 707, Part V. The ACLU argues that the definition of "sexual contact" might make sense when applied to sexual assault under HRS §§ 707–730, 707–731, 707–732, and 707– 733; however, it does not make sense when applied to prostitution under HRS § 712– 1200.

We concede that sexual assault and prostitution are distinguishable offenses. Therefore, it might have been wise for the legislature to adopt either a different definition of "sexual contact" specifically applicable to prostitution or even to eliminate "sexual contact" as a basis for prostitution. Certainly, it

---

4. HRS § 707–700 also provides in relevant part:

"Deviate sexual intercourse" means any act of sexual gratification between a person and an animal or a corpse, involving the sex organs of one and the mouth, anus, or sex organs of the other.

. . . .

"Sexual penetration" means vaginal intercourse, anal intercourse, fellatio, cunnilingus, anilingus, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required.

would have been reasonable for the legislature to limit prostitution to "sexual penetration." However, the legislature did not do so. Instead, in HRS § 712–1200, the legislature expressly incorporated the broad definition of "sexual contact" found in HRS § 707–700. We cannot ignore the plain and unambiguous language of the statutes at issue in this case.

### 2. *Vagueness and Overbreadth*

▆ Richie argues that his conviction of promoting prostitution in the second degree should be reversed because the definition of "sexual contact" is unconstitutionally vague and overbroad.

▆ The following standard of review applies to constitutional challenges based on vagueness or overbreadth:

First, the constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest and unmistakable.

Second, we construe penal statutes narrowly, considering them in light of precedent, legislative history, and common sense.

Third, where possible, we will read a penal statute in such a manner as to preserve its constitutionality.

To accord a constitutional interpretation of a provision of broad or apparent unrestricted scope, courts will strive to focus the scope of the provision to a narrow and more restricted construction.

Provisions of a penal statute will be accorded a limited and reasonable interpretation under this doctrine in order to preserve its overall purpose and to avoid absurd results. Put differently, a statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it. Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory.

*State v. Bates*, 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997) (quoting *State v. Gaylord*, 78 Hawai'i 127, 137–38, 890 P.2d 1167, 1177–78 (1995)) (brackets, ellipses, and internal block quotes omitted).

▆ When addressing a vagueness challenge, we apply the following principles:

Due process of law requires that a penal statute state with reasonable clarity the act it proscribes and provide fixed standards for adjudicating guilt, or the statute is void for vagueness. Statutes must give the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that he or she may choose between lawful and unlawful conduct. This standard is essentially indistinguishable from the applicable standard under federal law. Thus we have so far not departed from the federal constitutional law in the area of void for vagueness challenges to criminal statutes.

Under the applicable federal law, a criminal statute is void for vagueness unless it: 1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly, and 2) provides explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.

*Id.* at 220–21, 933 P.2d at 57–58 (quoting *Gaylord*, 78 Hawai'i at 138, 890 P.2d at 1178) (internal block quotes omitted).

In the present case, the definition of "sexual contact" in HRS § 707–700 is crystal clear. The statute establishes a bright-line rule, which in laypersons' terms can be summarized as: "You can look but you can't touch." This definition gives the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. It also constitutes an explicit standard that avoids arbitrary and discriminatory enforcement and is

not subjective. Thus, the statute is not unconstitutionally vague.

"The doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conduct as well as unprotected conduct is included in its proscriptions." *Gaylord,* 78 Hawai'i at 142, 890 P.2d at 1182 (quoting *State v. Kaneakua,* 61 Haw. 136, 143, 597 P.2d 590, 594 (1979)). Richie argues that the constitutionally protected conduct infringed upon by the definition of "sexual contact" is nude dancing.

It is true that, under certain circumstances, nude dancing is protected by the First Amendment. The United States Supreme Court has noted:

> Several of our cases contain language suggesting that nude dancing of the kind involved here is expressive conduct protected by the First Amendment. In *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 [95 S.Ct. 2561, 45 L.Ed.2d 648] (1975), we said: "[A]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized in *California v. LaRue,* 409 U.S. 109, 118 [93 S.Ct. 390, 34 L.Ed.2d 342] (1972), that this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances." In *Schad v. Mount Ephraim,* 452 U.S. 61, 66 [101 S.Ct. 2176, 68 L.Ed.2d 671] (1981), we said that "[f]urthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation" (citations omitted). These statements support the conclusion of the Court of Appeals that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so.

*Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565–66 [111 S.Ct. 2456, 115 L.Ed.2d 504] (1991). However, nothing in the definition of "sexual contact" in HRS § 707–700 prohibits nude dancing *per se.* Individuals are not prevented from dancing in the nude. The conduct prohibited is the touching of sexual or intimate parts. Thus, the statute still permits dancing in the nude and allows customers to *look* at performers dancing in the nude; what the customers cannot do is *touch* the performers. The dancing at issue in *Barnes* and *Schad* apparently did not involve touching. Both cases involved coin-operated booths with the dancer performing behind a glass panel. *See Barnes,* 501 U.S. at 563, 111 S.Ct. 2456; *Schad,* 452 U.S. at 62, 101 S.Ct. 2176. Although *Barnes* also involved "go-go dancing," there is no indication that this dancing involved physical contact with customers. *Barnes,* 501 U.S. at 563, 111 S.Ct. 2456. Similarly, the "topless dancing" in *Doran* does not appear to have involved physical contact. *Doran,* 422 U.S. at 924, 95 S.Ct. 2561. Thus, we believe that HRS § 707–700 does not unconstitutionally interfere with the protected activity of nude dancing.

Richie raises additional examples of the statute's alleged overbreadth that we believe are extreme and patently absurd. Richie argues that dance instructors, fashion designers, and tailors would be affected by the definition of "sexual contact." His most outrageous example is "sitting on the lap of Santa Claus, or the Easter bunny." If one compares the conduct at issue in this case, *see supra* part I, with the examples just mentioned, it is clear that they are distinguishable. The conduct in this case had clear sexual overtones. Moreover, under HRS § 712–1200, the sexual contact must be *for* a fee; conversely, the fee must be specifically *for* the sexual contact. The examples cited by Richie are clearly absurd. In reviewing a penal statute, we accord it "a limited and reasonable interpretation . . . in order to preserve its overall purpose and to avoid absurd results." *Bates,* 84 Hawai'i at 220, 933 P.2d at 57. Richie's attempt to apply HRS § 707–700 to extreme and absurd situations is not sufficient to render it unconstitutionally overbroad.

### 3. *Sufficiency of the Evidence*

Richie next argues that there was insufficient evidence to support a finding of prostitution. Insofar as promoting prostitution in the second degree incorporates the concept of prostitution, Richie is apparently

arguing that there was insufficient evidence to support his conviction. We have repeatedly stated:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997) (quoting *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)) (emphasis omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Eastman*, 81 Hawai'i at 135, 913 P.2d at 61.

In the present case, there was sufficient evidence of prostitution to support the jury's verdict. The testimony of Officer Villanueva and Officer Okagawa clearly support the conclusion that sexual contact occurred. There was abundant and repeated contact with breasts, contact with genitalia, and simulation of sexual intercourse. Some of the contact occurred directly and some of it occurred through clothing. Moreover, there was evidence supporting the conclusion that the officers obtained an agreement to engage in sexual conduct with Monica Alves. There was also evidence indicating that the sexual contact occurring that night was for a fee. Officer Villanueva paid Richie $750 for the entire performance. Inasmuch as the performance included sexual contact, that $750 payment constituted a fee for sexual contact. In addition, the jury could have reasonably concluded, based on the circumstances, that the tips received by the dancers also constituted a fee for sexual contact. Finally, the jury could have concluded that the $225 discussed in relation to having sex with Alves constituted a fee. Therefore, there was sufficient evidence of prostitution.

In addition, Richie's activities in organizing and encouraging the performance that night, as well as his receipt of the $750 fee and a portion of the tips, support the conclusion that he advanced or profited from prostitution. His business, Fanta–See Express, could be interpreted as a prostitution enterprise that he controlled. Finally, three dancers were involved in the performance; therefore, there was evidence of two or more prostitutes. Thus, there was sufficient evidence to support Richie's conviction of promoting prostitution.

### B. Whether Richie's Conviction Under HRS § 842–2(2) Should Be Reversed

■ Richie argues that his conviction of unlawful ownership or operation of business under HRS § 842–2(2) should be reversed. Richie raises a number of arguments; however, we need only address one of them.[5] Richie argues that HRS § 701–109(1)(d) bars his conviction, and we agree.[6]

HRS § 701–109 (1993) provides in relevant part:

> **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which

---

5. Richie also argues that there was insufficient evidence to support the conviction, that the trial court delivered an erroneous instruction on the definition of a RICO "enterprise," that the Double Jeopardy Clauses of the United States and Hawai'i Constitutions barred his conviction, and that HRS § 701–109(1)(e) barred his conviction. Inasmuch as we are reversing his conviction on other grounds, it is unnecessary for us to address these issues.

6. This issue was not raised below and was not included in the point of error section of Richie's opening brief (although it was raised in the argument section of the brief). Ordinarily, this would justify our refusal to address the issue on appeal. However, this court has reviewed possible violations of HRS § 701–109 under the plain error doctrine in the past. *See Alston*, 75 Haw. at 529–30, 865 P.2d at 164–65. Consequently, despite the failure of trial counsel and appellate counsel to properly raise this issue, we address it *sua sponte*.

such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

. . . .

 (d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct[.]

This provision was based on section 1.07(1)(d) of the American Law Institute's Model Penal Code (MPC). The commentary to this section explains:

 (d) *General and Specific Prohibition of Designated Conduct.* Subsection (1)(d) prohibits conviction of more than one offense based on the same conduct when the offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct. For example, the same conduct cannot be the basis of convicting under a general statute prohibiting lewd conduct and under a specific statute prohibiting indecent exposure. In the absence of an expressed intention to the contrary, it is fair to assume that the legislature did not intend that there be more than one conviction under these circumstances.

Comment to MPC § 1.07 (1985) (footnote omitted).

 ■ Hawai'i case law applying HRS § 701–109(1)(d) has tended to focus on the question whether the statutes at issue "seek to redress the same conduct." *State v. Hoo-*

*pii,* 68 Haw. 246, 251, 710 P.2d 1193, 1196 (1985). Where the "main thrust" of one statute differs from another, HRS § 707–709(1)(d) does not prohibit convictions under both statutes. *Id.* at 251, 710 P.2d at 1196–97. This court has held that the following prosecutions are not barred by HRS § 701–109(1)(d): robbery and burglary, *see State v. Vinge,* 81 Hawai'i 309, 320 n. 12, 916 P.2d 1210, 1221 n. 12 (1996); theft and fraudulent use of a credit card, *see State v. Freeman,* 70 Haw. 434, 440–41, 774 P.2d 888, 892 (1989); and kidnapping and rape/sodomy, *see Hoopii,* 68 Haw. at 251, 710 P.2d at 1196–97.

 ■ The statutes at issue in the present case are HRS § 712–1203 [7] and HRS § 842–2. HRS § 842–2 (1993) provides in relevant part:

 **Ownership or operation of business by certain persons prohibited.** It shall be unlawful:

 . . . .

 (2) For any person through a racketeering activity or through collection of an unlawful debt[ [8]] to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.[ [9]]

It is clear that Richie was convicted based on "maintain[ing], directly or indirectly, . . . control of [an] enterprise" through racketeering activity. *See id.* Nothing in this case involved the acquisition of an ownership interest in or control of Fanta–See Express. Thus, Richie's conviction was based on maintaining control of an enterprise through racketeering activity.[10] However, Richie's

---

7. *See supra* part II.A.1 for the text of HRS § 712–1203.

8. HRS § 842–1 (1993) provides in relevant part:

 "Racketeering activity" means any act or threat involving but not limited to murder, kidnapping, gambling, criminal property damage, robbery, bribery, extortion, theft or prostitution, or any dealing in narcotic or other dangerous drugs which is chargeable as a crime under state law and punishable by imprisonment for more than one year.

 "Unlawful debt" means a debt incurred or contracted in an illegal gambling activity or business or which is unenforceable under state law in whole or in part as to principal or interest because of the law relating to usury.

9. *See State v. Ontai,* 84 Hawai'i 56, 929 P.2d 69 (1996) (adopting a definition of "enterprise" under HRS § 842–2).

10. It should be noted that HRS § 842–2(2) is primarily directed toward a slightly different situation. As one RICO treatise stated:

 "Thus § 1962(b) [the federal equivalent of HRS § 842–2(2) ] was aimed primarily at situations in which criminal methods were employed to take control of legitimate businesses. To . . . cite Mario Puzo, *The Godfather* depicts a violation of § 1962(b) when Michael Corleone obtained an interest in a Las Vegas gambling casino by means of murder and extortion, both predicate offenses under the RICO Act.

D. McCormack, 1 *Racketeer Influenced Corrupt Organizations* § 5.22, at 5–25 (1997). Therefore,

conviction of promoting prostitution in the second degree was based on essentially the same conduct. Richie "[a]dvance[d] or profit[ed] from prostitution by managing, supervising, *controlling,* or owning ... a prostitution business or *enterprise* [.]" *See* HRS § 712–1203 (emphases added).

On the one hand, Richie was convicted of RICO based on maintaining control of an enterprise through racketeering activity; on the other hand, he was convicted of promoting prostitution based on controlling a prostitution enterprise. It is clear that the two statutes, under the circumstances of the present case, seek to redress the same conduct—the control of an enterprise involved in criminal activity. The "main thrust" of both statutes is basically the same. The only difference between the two statutes is that HRS § 842–2(2) is directed against enterprises in general, while HRS § 712–1203 is directed against prostitution enterprises specifically. We must, therefore, assume that the legislature did not intend that there be more than one conviction under these circumstances. Consequently, HRS § 701–109(1)(d) prohibits conviction under both statutes.

 The next question is which conviction should be reversed. The prosecution suggests that we reverse Richie's conviction for promoting prostitution in the second degree, *i.e.,* the conviction with the lesser penalty. The ICA apparently did so in *State v. Liuafi,* 1 Haw.App. 625, 623 P.2d 1271 (1981), a case involving inconsistent findings of fact in violation of HRS § 701–109(1)(c). The ICA affirmed the defendant's conviction of attempted murder and vacated his conviction of failure to render assistance. *Id.* at 644, 623 P.2d at 1283. However, we believe that a different rule should be applied to HRS § 701–109(1)(d).

We have often held that

the enterprise in an HRS § 842–2(2) case is ordinarily an innocent victim of the defendant. However, federal case law suggests that the enterprise does not have to be an innocent victim, but can be the direct or indirect beneficiary of the defendant's conduct. Thus, maintaining control of an enterprise through racketeering activity, in violation of HRS § 842–2(2), can be shown if: (1) racketeering activity occurred, (2) the en

where there is a "plainly irreconcilable" conflict between a general and a specific statute concerning the same subject matter, the specific will be favored. However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored.

*State v. Vallesteros,* 84 Hawai'i 295, 303, 933 P.2d 632, 640, *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997). HRS § 842–2(2) and HRS § 712–1203 constitute general and specific statutes, respectively. Insofar as HRS § 701–109(1)(d) bars conviction of both offenses, the two statutes conflict. It is not possible to give effect to both; therefore, the specific statute governs. Consequently, we must affirm Richie's conviction under HRS § 712–1203 and reverse his conviction under HRS § 842–2(2).

## C. Whether a Husband and Wife Can Serve on the Same Jury

During jury selection, it was revealed that two jurors, Mr. and Mrs. Ferguson, were married to each other. Defense counsel asked the trial court its policy on husbands and wives serving on the same jury. The trial court refused to allow a challenge for cause because, as long as spouses can follow the jury instructions, "it's just like any body else."

 "A fair trial by an impartial jury is guaranteed to the criminally accused by both the sixth amendment of the United States Constitution and article I, § 14 of the Hawaii Constitution." *State v. Samonte,* 83 Hawai'i 507, 523, 928 P.2d 1, 17 (1996) (quoting *State v. Okumura,* 78 Hawai'i 383, 393, 894 P.2d 80, 90 (1995)). "We review the trial court's decision to pass a juror for cause under the abuse of discretion standard." *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (citing *State v. Baron,* 80 Hawai'i 107,

terprise received income from the racketeering activity, and (3) that income was used in the operations of the enterprise. *See Schreiber Distributing Co. v. Serv–Well Furniture Co., Inc.,* 806 F.2d 1393, 1396–98 (9th Cir.1986) (citing *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)).

114, 905 P.2d 613, 620, *reconsideration granted in part,* 80 Hawai'i 187, 907 P.2d 773 (1995)).

Richie argues on appeal that

there is a bias inherent in the [marital] relationship when it comes to an important decision, such as in a criminal case where a defendant is facing imprisonment.... Marriage is a partnership with bias and deep feeling towards each other. The marriage between Mr. and Mrs. Ferguson created marital bias in the instant case. The marriage relationship is too close for comfort in a situation involving a person's guilt or innocence.

■ We disagree with Richie's assertion that jurors who are married to each other must be disqualified from jury service. Both Mr. and Mrs. Ferguson expressly stated during voir dire that they would each make their own decisions and would not automatically go along with the other person. Thus, there was no evidence that either Mr. or Mrs. Ferguson was incapable of fulfilling his or her responsibilities as a juror. Richie cannot demonstrate *actual* impairment of the Fergusons' ability to serve as jurors.

■ This court, however, held in *Kauhi, supra,* that *implied* bias can provide a basis for challenging jurors for cause. In *Kauhi,* we quoted a concurring opinion by Justice O'Connor for the proposition that "there are some *extreme* situations that would justify a finding of implied bias." *Id.* at 200, 948 P.2d at 1041 (quoting *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring)) (emphasis altered). We held that "where a prospective juror is a prosecutor currently employed by the same office as the prosecutor trying the defendant, the court shall imply bias as a matter of law and dismiss the prospective juror for cause." *Id.*

We believe that the present case is distinguishable from *Kauhi.* The present case did not involve an "*extreme* situation" equivalent to a prospective juror working as a prosecutor in the same office as the prosecutor trying the case. Neither did this case involve a

juror related to the defendant, the attorneys, or the witnesses. The term "extreme situations" in *Kauhi* and *Smith* refers to situations in which there is an uncomfortably close relationship between a juror and either a party, counsel, or a witness on one side of the case. Here, there was no such relationship between Mr. or Mrs. Ferguson, on the one hand, and a person associated with the prosecution or the defense, on the other. Rather, the challenged relationship was between *two jurors.* In contrast to the *Kauhi /Smith* situation, the present situation does not create a danger that a juror will be biased or will be perceived to be biased in favor of one side or the other. Thus, there is no "appearance of impropriety" and no need to imply bias as a matter of law.

The only possible danger when two jurors are spouses is that one juror might automatically vote along with the other. In this day and age, in which marriage is regarded as an equal partnership, *see Gussin v. Gussin,* 73 Haw. 470, 492, 836 P.2d 484, 495 (1992) (recognizing the partnership model of marriage), the danger of one spouse dictating a decision in a jury trial to the other spouse should be regarded as minimal. Nevertheless, any conceivable danger can easily be dispelled by asking both jurors, on voir dire, whether they would make their own decisions independently. Inasmuch as Mr. and Mrs. Ferguson both assured the court that they would each make their own decisions, Richie's right to an impartial jury was not violated.

On this particular record before us, we hold that the trial court did not abuse its discretion in failing to excuse Mr. or Mrs. Ferguson for cause.

### D. *Evidentiary Issues*

■ We apply two different standards of review in addressing evidentiary issues. "Where the evidentiary ruling at issue concerns admissibility based on relevance, under [Hawai'i Rules of Evidence (HRE)] Rules 401 and 402,[11] the proper standard of appel-

---

11. HRE Rule 401 provides:

**Definition of "relevant evidence".** "Relevant evidence" means evidence having any ten-

late review is the right/wrong standard." *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (quoting *State v. Kupihea*, 80 Hawai'i 307, 314, 909 P.2d 1122, 1129 (1996)) (original brackets and ellipses omitted). "Evidentiary decisions based on HRE Rule 403,[12] which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Id.* (quoting *Walsh v. Chan*, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995)). "HRE 404[13] represents a particularized application of the principle of HRE 403 (*see* Commentary to HRE 404), and we will employ the same abuse of discretion standard of review." *Id.* (quoting *State v. Alston*, 75 Haw. 517, 538, 865 P.2d 157, 168 (1994)).

■ Richie argues that the trial court erred in admitting a statement made by Richie to KPD Lieutenant K.C. Lum. Lieutenant Lum testified that, three days after the arrests, Richie came to the police station and asserted that the conduct in this case did not constitute prostitution. According to Lieutenant Lum, Richie stated that he knew all links in the prostitution business, that his wife had been a prostitute in Nevada, that he had been involved with prostitution from a young age, that he knew what prostitution was, and that what occurred in the present case was not prostitution. On appeal, Richie argues that this testimony constituted improper character evidence relating to a prior bad act, in violation of HRE Rule 404(b), and was prejudicial, in violation of HRE Rule 403. We disagree.

Under HRE Rule 404(b), evidence of other crimes, wrongs, or acts is ordinarily not admissible to prove character; however, such acts are admissible when they are relevant/probative of another fact that is of consequence to the determination of the action. *See State v. Clark*, 83 Hawai'i 289, 300, 926 P.2d 194, 205, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996); *State v. Renon*, 73 Haw. 23, 32, 828 P.2d 1266, 1270, *reconsideration denied*, 73 Haw. 625, 858 P.2d 734 (1992). The acts at issue in the present case consisted of Richie's prior involvement in and experience with prostitution and the prostitution business. These acts were probative of another fact of consequence because they related to Richie's *knowledge* of prostitution and the prostitution business. Although the list of permissible purposes in HRE Rule 404(b) is not exhaustive, *see Clark*, 83 Hawai'i at 300, 926 P.2d at 205, "knowledge" is indeed expressly listed. Richie's knowledge of prostitution was relevant because the state of mind required for promoting prostitution in the second degree is "knowingly." *See* HRS § 712–1203. Moreover, Richie's knowledge of the prostitution business was relevant because "controlling ... a prostitution business or enterprise" is an element of promoting prostitution in the second degree. *See id.*

■ "[O]nce the evidence of prior bad acts is determined to be relevant, the court must then balance the probative value of the relevant evidence against its prejudicial impact." *Clark*, 83 Hawai'i at 302, 926 P.2d at 207 (citing *Renon*, 73 Haw. at 32, 828 P.2d at

dency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

HRE Rule 402 provides:

Relevant evidence generally admissible; irrelevant evidence inadmissible. All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

12. HRE Rule 403 provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if

its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

13. HRE Rule 404(b) provides in relevant part:

Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

1270). As noted above, the statement in question was probative of Richie's knowledge of prostitution and the prostitution business. Furthermore, its prejudicial effect was mitigated by the fact that the overall thrust of the statement was exculpatory. Richie essentially told Lieutenant Lum that he knew prostitution, that he had experience with prostitution, and that *what occurred in this case was not prostitution.* Admission of this statement allowed into evidence Richie's opinion that the conduct in this case was not prostitution without subjecting him to cross-examination. In other words, the effect of the statement was to allow Richie to testify without waiving his right against self-incrimination. Consequently, the prejudicial effect of the statement was minimized by its overall exculpatory import. Thus, the probative value of the statement outweighed its prejudicial effect, and the trial court did not abuse its discretion. The statement was admissible under HRE Rules 404(b) and 403.

■■■ Richie next argues that the trial court erred in admitting a videotape of the arrest taken by the police. Richie argues that the videotape "contains graphic video of the co-defendant women" and was highly prejudicial and of no probative value, in violation of HRE Rule 403.[14] We disagree.

Review of the challenged videotape indicates that its principal purpose was to show the layout of the crime scene and the persons involved. The camera moves through the condominium and records the appearance of the overall scene. Therefore, the videotape had probative value. As for prejudice caused by the "graphic" nature of the videotape, only a brief sequence involves any nudity at all. Two of the women appear in the videotape without their clothes, but for the most part, they are obscured by two large cushions held in front of them. In short, the videotape can hardly be termed "graphic."

Thus, the trial court did not abuse its discretion in admitting the videotape into evidence.

■■■ Richie next argues that the photographs of dancers in various positions and states of undress obtained from Richie's home and briefcase were inadmissible because they were irrelevant, in violation of HRE Rules 401 and 402.[15] Again, we disagree.

The photographs at issue were not of the specific events that occurred on September 16, 1995. Some of the photographs show a male dancer, with whipped cream and oil on his chest, dancing in front of female customers. However, all three of the dancers on September 16, 1995 were women. Moreover, one of the photographs shows Alves lying in bed with a fully-clothed elderly gentleman. The testimony describing the events of September 16, 1995 makes no mention of Alves being photographed in bed with an elderly man. Therefore, the photographs were apparently of different performances occurring prior to September 16, 1995. Evidence of these additional performances was relevant to the offense of promoting prostitution in the second degree.

A conviction under HRS § 712–1203 requires proof that the defendant "manag[ed], supervis[ed], controll[ed], or own[ed] ... a prostitution business or enterprise[.]" The photographs at issue here, along with the advertisement records, the general excise tax license, the employee records, and the eighty client contracts, were relevant in proving that Richie controlled a prostitution business or enterprise. The evidence demonstrated that the events of September 16, 1995 did not simply constitute an isolated episode of "advanc[ing] or profit[ing] from prostitution" but, in fact, constituted part of the operation of a prostitution business· or enterprise. Consequently, the trial court did not err in admitting the photographs.

---

14. Trial counsel did not object to the admission of this evidence in the trial court. Thus, we would ordinarily refuse to address this issue on appeal. *See* HRE Rule 103(a)(1). However, we may notice errors not raised below under the plain error doctrine. *See* HRE Rule 103(d). Moreover, Richie relies on this issue as a basis for his ineffective assistance of counsel claim.

*See infra* part II.E. Therefore, we address the merits of the issue here.

15. Trial counsel also failed to object to the admission of this evidence in the trial court. Nevertheless, we address the merits of the issue for the same reasons discussed *supra* in note 14.

### E. *Ineffective Assistance of Counsel*

 In an ineffective assistance of counsel claim, the question is: "When viewed as a whole, was the assistance provided to the defendant within the range of competence demanded of attorneys in criminal cases?" *State v. Fukusaku,* 85 Hawai'i 462, 479, 946 P.2d 32, 49 (1997) (quoting *State v. Edwards,* 81 Hawai'i 293, 300, 916 P.2d 703, 710 (1996)). This court has also held that

> the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*Id.* at 480, 946 P.2d at 50 (quoting *Edwards,* 81 Hawai'i at 300, 916 P.2d at 710). "Determining whether a defense is 'potentially meritorious' requires an evaluation of the possible, rather than the probable, effect of the defense on the decision maker.... Accordingly, no showing of 'actual' prejudice is required to prove ineffective assistance of counsel." *Id.* (quoting *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994)).

 Richie argues that trial counsel's performance was constitutionally ineffective on various grounds. Richie argues that trial counsel erred in failing to file a pre-trial motion to dismiss the indictment based on insufficiency of the evidence. However, trial counsel did move for judgment of acquittal at trial. *See* Hawai'i Rules of Penal Procedure (HRPP) Rule 29. Therefore, insufficiency of the evidence was raised, and Richie has not lost a potentially meritorious defense because of the failure to file a pre-trial motion.

 Richie next argues that trial counsel failed to investigate and obtain the testimony of the four construction workers who were also present at the party. However, the record lacks reliable evidence indicating what the construction workers would have testified to. Ineffective assistance of counsel claims based on the failure to obtain witnesses must be supported by affidavits or sworn statements describing the testimony of the prof-

fered witnesses. *Fukusaku,* 85 Hawai'i at 481, 946 P.2d at 51; *State v. Reed,* 77 Hawai'i 72, 84, 881 P.2d 1218, 1230 (1994); *State v. Aplaca,* 74 Haw. 54, 68–69, 837 P.2d 1298, 1306 (1992). Inasmuch as Richie has not supported his ineffective assistance claim with affidavits or sworn statements, his claim fails.

 Richie also argues that trial counsel erred in failing to call any of the four women involved in this case as witnesses. The calling of witnesses is a strategic decision that is generally left to defense counsel. The ABA Defense Function Standards provide useful guidance in determining which decisions must be made by the defendant and which decisions are the province of counsel:

**Standard 4–5.2 Control and Direction of the Case**

(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:

(i) what pleas to enter;

(ii) whether to accept a plea agreement;

(iii) whether to waive a jury trial;

(iv) whether to testify in his or her own behalf; and

(v) whether to appeal.

(b) Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate. Such decisions include what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced.

American Bar Association, *Standards for Criminal Justice—Prosecution Function and Defense Function,* Standard 4–5.2 (3d ed.1993) [hereinafter *ABA Defense Function Standards* ]. Thus, the calling of witnesses is generally a strategic decision for defense counsel. In the context of an ineffective assistance of counsel claim, this court has held that "matters presumably within the judgment of counsel, like *trial strategy,* 'will rarely be second-guessed by judicial hind-

sight.'" *State v. Smith*, 68 Haw. 304, 311, 712 P.2d 496, 501 (1986) (quoting *State v. El'Ayache*, 62 Haw. 646, 649, 618 P.2d 1142, 1144 (1980)) (emphasis added). "[T]he decision whether to call witnesses in a criminal case is normally a matter within the judgment of counsel and, accordingly, will rarely be second-guessed by judicial hindsight." *Aplaca*, 74 Haw. at 70, 837 P.2d at 1307.[16] In the present case, the decision of trial counsel not to call the four women appears to have been a strategic decision, and it will not be second-guessed on appeal.

Even if we could review trial counsel's strategic decision, it was apparently a valid one. In return for the prosecution dismissing the charges against them, the four women agreed to testify truthfully in Richie's trial. If trial counsel had called them as defense witnesses, they might have provided testimony that hurt Richie. Thus, it was a legitimate strategic decision not to call them. Furthermore, the record indicates that the trial court ordered a recess so that counsel could discuss the calling of witnesses with Richie. Thus, it appears that Richie himself approved the strategy not to call the four women as witnesses.

Richie also notes that trial counsel failed to object to the admission into evidence of the videotape of the arrest and the photographs of dancers in various positions and states of undress. According to Richie, this constitutes ineffective assistance of counsel. However, regardless of whether counsel objected or not, the evidence was admissible. *See supra* part II.D. Failing to object to *admissible* evidence cannot be considered an error or omission. Moreover, because the evidence was admissible, the failure to object did not deprive Richie of a potentially meritorious defense.

■ Richie next argues that trial counsel erred in failing to successfully challenge the selection of Mr. and Mrs. Ferguson, the married couple, as jurors. However, there was no valid basis for challenging them for cause. *See supra* part II.C. Richie argues that trial counsel should have used a peremptory challenge to excuse them. However, according to the ABA Defense Function Standards, what jurors to accept or strike is a strategic decision primarily left to defense counsel. *ABA Defense Function Standards*, Standard 4–5.2(b). Therefore, we will not secondguess trial counsel's strategic decision on appeal.[17]

Richie also argues that trial counsel erred in failing to challenge the lack of African–Americans on the jury under *State v. Batson*, 71 Haw. 300, 788 P.2d 841 (1990). Under *Batson*, the discriminatory use of peremptory challenges is prohibited:

> [W]henever the prosecution so exercises its peremptory challenges as to exclude entirely from the jury all persons who are of the same ethnic[ ] minority as the defendant, and that exclusion is challenged by the defense, there will be an inference that the exclusion was racially motivated, and the prosecutor must, to the satisfaction of the court, explain his or her challenges on a non-ethnic[ ] basis.

*Id.* at 302–03, 788 P.2d at 842. *See also Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Nothing in the record indicates that the prosecution exercised its peremptory challenges in a discriminatory manner. In fact, nothing in the record indicates that any of the challenged jurors were African–American. Thus, there is no evidence supporting an ineffective assistance of counsel claim based on *Batson*.

■ Although Richie expressly relies on *Batson*, we believe that he is actually raising, somewhat inartfully, a different issue. His real argument appears to be that the jury did not reflect a fair cross-section of the commu-

---

**16.** However, when the failure to call a witness is the result of a failure to conduct a minimal investigation, it cannot be deemed a strategic decision. *See Aplaca*, 74 Haw. at 71, 837 P.2d at 1307 (citing *State v. Templin*, 805 P.2d 182, 188 (Utah 1990)). In *Aplaca*, the record contained trial counsel's admission that he did not investigate the prospective witnesses. *Id.* at 69, 837 P.2d at 1306. In contrast, nothing in the present case indicates that trial counsel failed to investigate the four women.

**17.** While the ABA Defense Function Standards do state that strategic decisions should be made by counsel "after consultation with the client," such consultation is qualified by the requirement that it be "feasible and appropriate." *ABA Defense Function Standards*, Standard 4–5.2(b).

nity. The selection of a jury from a representative cross-section of the community is an essential component of the right to an impartial jury guaranteed by the sixth amendment to the United States Constitution, *see Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and article I, section 14 of the Hawai'i Constitution, *see State v. Garrison,* 10 Haw.App. 1, 12, 860 P.2d 610, 616, *cert. denied,* 75 Haw. 581, 863 P.2d 989 (1993).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). *See also Garrison,* 10 Haw.App. at 13, 860 P.2d at 616.

██ Although it is clear that African–Americans qualify as a distinctive group in the community, Richie points to no evidence supporting the other two elements. There is no indication that African–Americans were underrepresented on the venire in relation to their number in the community. Even assuming *arguendo* that African–Americans were underrepresented, there is no indication that it was due to systematic exclusion in the jury selection process. Thus, there is insufficient evidence of a prima facie violation of the fair cross-section requirement. Consequently, trial counsel's failure to raise the issue at trial did not constitute ineffective assistance of counsel.

Finally, Richie argues that the performance of trial counsel was constitutionally ineffective based on a conflict of interest. Richie asserts that one of his trial attorneys was representing Monica Alves in a civil suit at the same time the attorney was representing Richie in the present case. Richie argues that because his attorney also represented a former co-defendant and potential prosecution witness, a conflict of interest existed that provides a basis for an ineffective assistance of counsel claim.

The issue of conflict of interest as a basis for an ineffective assistance of counsel claim was addressed in two cases decided by the Intermediate Court of Appeals (ICA): *State v. Reis,* 4 Haw.App. 327, 666 P.2d 612 (1983); and *State v. Pitt,* 77 Hawai'i 374, 884 P.2d 1150 (App.1994). In *Reis,* the ICA set forth the following analysis:

> A complaint of ineffective assistance of counsel based upon a conflict of interest generally arises from two situations. The first occurs where there is joint representation of co-defendants by one attorney or by members of the same firm. In such case, a defendant need only make a slight showing of actual prejudice in order to establish ineffective counsel. This is because the attorney involved in joint representation is particularly susceptible to disabling conflicts.
>
> The second, as in the case at bar, arises when there is dual representation, *i.e.,* where an attorney represents or formerly represented a hostile party or a witness. Dual representation does not present the same degree of risk as joint representation and, accordingly, the defendant must show either a real conflict of interest or a specific instance of prejudice before the right of effective assistance of counsel is deemed denied.
>
> The issue of dual representation is further broken down into concurrent and prior representation. Concurrent representation involves ongoing representation by the defendant's attorney of a prosecution witness or hostile party, while prior representation involves only a previous representation of the witness or hostile party.
>
> Concurrent representation of the defendant and an adverse witness or a hostile party places the attorney in a situation where he is forced to balance the zeal of his defense of the accused against any solicitude for his client, the witness or hostile party. This situation is deemed inherently conducive to divided loyalties and, therefore, as a matter of law, a real conflict of interest is said to exist. If the

defendant has not acquiesced in a representation involving a real or actual conflict, a mistrial or a new trial will be ordered depending on whether a verdict has been rendered.

Where the conflict of interest is based upon defense counsel's prior representation of a witness or hostile party, the courts have examined two factors relating to effective cross-examination in determining whether the attorney's undivided loyalties reside with his current client. The first involves the attorney's pecuniary interest in possible future business from the witness which causes the attorney to avoid vigorous cross-examination that may be embarrassing or offensive to the witness. The second involves the failure to use privileged information obtained from the witness for impeachment purposes or for thorough cross-examination because of the attorney's fear of misusing confidential information. Both factors should be closely examined by the courts in order to determine where the attorney's loyalty lies.

A defendant may, of course, waive his right to effective assistance of counsel. However, defendant must have knowledge of the conflict of interest and must knowingly and intelligently waive that right.

*Reis,* 4 Haw.App. at 330–32, 666 P.2d at 616 (citations omitted). The *Reis* analysis was subsequently followed in *Pitt. See Pitt,* 77 Hawai'i at 378–79, 884 P.2d at 1154–55. However, upon careful consideration, we believe that the standard adopted in *Reis* is now obsolete.

When *Reis* was decided in 1983, Hawai'i law was unclear as to whether a showing of actual prejudice [18] was required in ordinary ineffective assistance of counsel cases (*i.e.,* not involving conflicts of interest). *Compare State v. Antone,* 62 Haw. 346, 615 P.2d 101 (1980), *with State v. Torres,* 54 Haw. 502, 510 P.2d 494 (1973), and *Stough v. State,* 62 Haw. 620, 618 P.2d 301 (1980). In fact, *Reis* apparently assumed that actual prejudice was required in ordinary ineffective assistance

cases. *See Reis,* 4 Haw.App. at 330–31 n. 3, 666 P.2d at 616 n. 3 (citing *Stough, supra* ). Since then, this court has expressly held that actual prejudice is *not* required; it is only necessary to show the withdrawal or substantial impairment of a potentially meritorious defense. *Briones,* 74 Haw. at 464, 848 P.2d at 977. We rejected the requirement of actual prejudice largely because we believed that it was "unduly difficult for a defendant to meet." *Smith,* 68 Haw. at 310 n. 7, 712 P.2d at 500 n. 7. The standard set forth in *Reis,* however, requires "actual prejudice" or "a specific instance of prejudice" in conflict of interest cases. *Reis,* 4 Haw.App. at 330, 666 P.2d at 616. Insofar as we have expressly rejected actual prejudice in ordinary ineffective assistance cases, it makes no sense to require actual prejudice in conflict of interest cases. Consequently, *Reis* appears to be inconsistent with current Hawai'i law.

Furthermore, *Reis* is inconsistent with the federal conflict of interest standard. In the past, we have not hesitated to extend the protections of the Hawai'i Constitution beyond federal standards. *See, e.g., State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994); *State v. Lessary,* 75 Haw. 446, 453–57, 865 P.2d 150, 154–55 (1994). In the ineffective assistance of counsel context, the two-part test applicable to ordinary ineffective assistance cases "clearly affords greater protection" than the federal standard. *Aplaca,* 74 Haw. at 67 n. 2, 837 P.2d at 1305 n. 2. However, when departing from the federal standard, this court must at least provide the minimum level of protection required by the federal interpretation of the United States Constitution. *State v. Quino,* 74 Haw. 161, 170, 840 P.2d 358, 362, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993); *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967). The standard set forth in *Reis* appears to provide *less* protection than the federal standard in conflict of interest cases. Under the federal standard, proof of actual prejudice is not required because "prejudice

---

**18.** "Actual prejudice" is defined as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Briones v. State,* 74 Haw. 442,

464 n. 12, 848 P.2d 966, 977 n. 12 (1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

is presumed when counsel is burdened by an actual conflict of interest." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). To the extent that *Reis* requires actual prejudice, it is inconsistent with and provides less protection than the federal standard.

Finally, *Reis* was decided before the Hawai'i Rules of Professional Conduct (HRPC) were adopted on December 6, 1993 (becoming effective on January 1, 1994). The HRPC contain standards specifically addressing conflict of interest situations. *See, e.g.,* HRPC Rule 1.7. Insofar as the HRPC deal specifically with conflicts of interest, they are at least relevant in determining the circumstances in which a conflict of interest constitutes ineffective assistance of counsel.

■ Therefore, the analysis in *Reis* is fatally out of date, and we expressly overrule it. We believe that a new test is warranted for ineffective assistance of counsel based on conflict of interest.

HRPC Rule 1.7 provides:

### CONFLICT OF INTEREST: GENERAL RULE

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

The commentary discussing this rule provides further guidance in determining its meaning:

■ Paragraph (a) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation may conflict, such as co-plaintiffs or co-defendants, is governed by paragraph (b). An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met.

■ Ordinarily, a lawyer may not act as an advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated. However, there are circumstances in which a lawyer may act as advocate against a client. For example, a lawyer representing an enterprise with diverse operations may accept employment as an advocate against the enterprise in an unrelated matter if doing so will not adversely affect the lawyer's relationship with the enterprise or conduct of the suit and if both clients consent upon consultation. By the same token, government lawyers in some circumstances may represent government employees in proceedings in which a government agency is the opposing party. The propriety of concurrent representation can depend on the nature of the litigation. For example, a suit charging fraud entails conflict to a degree not involved in a suit for a declaratory judgment concerning statutory interpretation.

Commentary to HRPC Rule 1.7, Comments [7] & [8]. Based on the commentary, it is

clear that paragraph (b) applies, *inter alia,* to joint representation of co-parties. In the criminal context, this would be the situation in which the same attorney represents two or more co-defendants. Furthermore, paragraph (a) applies to concurrent representation of opposing parties in litigation. In the criminal context, because the party represented by the prosecuting attorney is the State of Hawai'i, this would be the situation in which defense counsel not only represents the defendant in the current case but also represents the State of Hawai'i in another case. Additionally, we believe that paragraph (a) encompasses the situation in which defense counsel represents, in another case, a person who is a prosecution witness in the current case. Paragraph (a) applies when an attorney's representation is "directly adverse" to another client. When the attorney cross-examines that client on the witness stand, he is clearly acting "directly adverse" to that client.

Under the federal conflict of interest standard, the defendant must demonstrate that his attorney "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *Cuyler,* 446 U.S. at 348, 350, 100 S.Ct. 1708. As noted above, proof of actual prejudice is not required. *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. Furthermore, a defendant may knowingly, intelligently, and voluntarily waive his right to conflict-free representation. *Garcia v. Bunnell,* 33 F.3d 1193, 1195 (9th Cir.1994), *cert. denied,* 514 U.S. 1024, 115 S.Ct. 1374, 131 L.Ed.2d 229 (1995).

In light of HRPC Rule 1.7 and the federal standard, it is clear that three factors are relevant in determining whether a conflict of interest constitutes ineffective assistance of counsel. The first factor is whether a relationship existed between the attorney and his/her clients giving rise to a conflict. The second factor is whether the relationship had an adverse effect on counsel's performance. And the third factor is whether counsel obtained the consent of his/her clients.

Therefore, we hold that defense counsel's representation is constitutionally ineffective under the Hawai'i Constitution if: (1) a relationship giving rise to a conflict of interest existed between defense counsel and his/her clients; and (2) either the relationship adversely affected defense counsel's performance, or the client did not consent to the relationship. Examples of a relationship giving rise to a conflict include joint representation of two, or more co-defendants and concurrent representation of both the defendant and either the State of Hawai'i or a prosecution witness.[19] Any demonstrable adverse effect on counsel's performance is sufficient; actual prejudice is not required. Finally, consent by the client should be given after full consultation.

In the present case, it is clear that trial counsel's performance was not constitutionally ineffective based on conflict of interest. First, it is apparently undisputed that trial counsel represented both Richie in the present case and Alves in a separate civil case. Inasmuch as Alves was an obvious potential witness in the present case, trial counsel's decision to represent Alves in the civil case was, at the very least, unwise. However, based on the particular circumstances of the present case, we do not believe that trial counsel's relationship with Richie and Alves supports an ineffective assistance of counsel claim. By the time Richie went to trial, the charges against Alves had been dismissed; therefore, she was no longer a co-defendant in the present case. Furthermore, Alves was never actually called as a witness in this case. Although she was clearly a *potential* witness, she was not an *actual* witness. Therefore, Alves was neither a co-defendant nor a prosecution witness in Richie's trial. Moreover, Richie was represented by *two* attorneys at trial, and it appears that only one of these attorneys was involved in Alves's civil suit. Consequently, under the particular circumstances of this case, we do not believe that trial counsel's relationship with his clients was sufficient to give rise to a conflict of interest.

**19.** *Reis* also addressed conflicts of interest in prior representation situations. However, inasmuch as prior representation is not at issue in the present case, we do not address it here.

Second, Richie argues that trial counsel's relationship with both Richie and Alves adversely affected counsel's performance in that it influenced his decision not to call Alves as a witness. We disagree. As noted above, trial counsel's decision was the result of trial strategy. It is significant that trial counsel did not call *any* of the four women as witnesses. Had counsel failed to call *only* Alves, then there might have been support for Richie's argument. However, the fact that counsel did not call *any* of the four women indicates that it was part of the overall trial strategy.

Finally, there is a distinct possibility that Richie consented to the relationship. In a memorandum submitted to the trial court, trial counsel asserted that he "obtained the appropriate waivers." This assertion is contained in a memorandum rather than in an affidavit or sworn testimony; therefore, it does not constitute reliable evidence of consent and we cannot base our decision upon it. Nevertheless, it does indicate that the issue was in dispute. It is the defendant's burden to prove ineffective assistance of counsel. *Fukusaku,* 85 Hawai'i at 480, 946 P.2d at 50. Consequently, it was Richie's burden to prove that trial counsel did not obtain the

necessary consent. Other than uncorroborated assertions, Richie points to no evidence in the record supporting his claim.[20] In the past, we have required affidavits or sworn testimony to support ineffective assistance of counsel claims. *Id.* at 481, 946 P.2d at 51; *Reed,* 77 Hawai'i at 84, 881 P.2d at 1230; *Aplaca,* 74 Haw. at 68–69, 837 P.2d at 1306. Therefore, Richie has failed to meet his burden of demonstrating that trial counsel did not obtain the necessary consent from his client.

For the reasons discussed above, Richie's ineffective assistance of counsel arguments are meritless.[21]

## III. *CONCLUSION*

Accordingly, we affirm Richie's conviction of promoting prostitution in the second degree, but we reverse his conviction of unlawful ownership or operation of business.

---

**20.** Richie relies on a memorandum submitted in the trial court asserting that defense counsel's representation of Richie and Alves created a possible conflict of interest. This memorandum is inadequate because it is simply an uncorroborated assertion of counsel and not an affidavit or sworn testimony.

**21.** Richie also argues that trial counsel erred in failing to object to the jury instruction defining a

RICO "enterprise" and in failing to offer a correct instruction. Due to our disposition of Richie's RICO conviction *supra* part II.B, it is unnecessary for us to address this issue.