105 P.3d 242

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Scott Brian SMITH, Defendant–Appellant.**

**No. 25544.**

Intermediate Court of Appeals of Hawai'i.

Dec. 28, 2004.

Certiorari Denied Feb. 4, 2005.

---

Artemio C. Baxa, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

Shawn A. Luiz, Esq., on the briefs, for Defendant–Appellant.

BURNS, C.J., WATANABE and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Scott Brian Smith (Smith) appeals from the Judgment entered on November 20, 2002, by the Circuit Court of the Second Circuit (the circuit court).[1] Smith was convicted of assaulting, threatening, kidnapping, and repeatedly raping the complaining witness (the CW), who was his former girlfriend and the mother of his young son. Smith was found guilty after a jury trial of the following offenses, all of which occurred on June 26, 1999:

> Count 1: Assault in the first degree, in violation of Hawaii Revised Statutes (HRS) § 707–710 (1993), as a lesser included offense of the charge of Attempted Murder in the second degree.

> Count 2: Terroristic Threatening in the first degree with the use of a dangerous instrument, namely a utility knife, in violation of HRS § 706–716(1)(d) (1993).

> Count 3: Sexual Assault in the first degree based on Smith's subjecting the CW to an act of sexual penetration by strong compulsion by placing his fingers into

---

1. The Honorable Shackley F. Raffetto presided.

her vagina, in violation of HRS § 707–730(1)(a) (1993).

Count 4: Sexual Assault in the first degree based on Smith's subjecting the CW to an act of sexual penetration by strong compulsion by placing his penis into her vagina.

Count 5: Sexual Assault in the first degree based on Smith's subjecting the CW to an act of sexual penetration by strong compulsion by placing his fingers into her vagina.

Count 6: Sexual Assault in the first degree based on Smith's subjecting the CW to an act of sexual penetration by strong compulsion by placing his penis into her vagina.

Count 8: Kidnapping with the intent to inflict bodily injury on the CW and/or to subject her to a sexual offense, in violation of HRS § 707–720(1)(d) (1993).

Count 9: The use or threatened use of a deadly or dangerous weapon, namely a utility knife, while engaged in the commission of a crime, in violation of HRS § 134–51(b) (1993).

The circuit court sentenced Smith to a total of forty-five years of imprisonment, imposing the following terms of imprisonment consecutive to each other: 1) concurrent twenty-year terms of imprisonment on Counts 3, 4, 5, and 6; 2) a ten-year term of imprisonment on Count 1; 3) a ten-year term of imprisonment on Count 8; and 4) concurrent five-year terms of imprisonment on Counts 2 and 9.

On appeal, Smith contends that 1) the State of Hawaii (the State) failed to produce sufficient evidence to support his sexual assault convictions; 2) the State elicited testimony that constituted an impermissible comment on his exercise of his right to remain silent; 3) the circuit court committed plain error in permitting the State to bolster the CW's testimony through questioning her about wearing a religious article; 4) the circuit court committed plain error in allowing Smith's trial counsel to waive Smith's presence during the settling of jury instructions; 5) Smith's trial counsel failed to provide Smith with effective assistance; and 6) the circuit court abused its discretion in imposing Smith's sentence. We affirm.

## BACKGROUND

### A. The State's Trial Evidence

The CW was the State's main witness at trial. She testified about her relationship with Smith and the events that led to his criminal charges.

### 1. The CW's Relationship With Smith

Smith and the CW met on Maui in April of 1995 and began living together. Their relationship produced a son who was born in October of 1996. In February of 1999, the CW broke up with Smith and considered their relationship to be over. Smith moved to Oahu and got a job. The CW stayed on Maui with her son and continued to work for a helicopter tour business. She took on a roommate to help defray the cost of her rent.

In June of 1999, Smith quit his job on Oahu and planned to move to Arizona. The CW had also decided to leave Maui and find a job in Las Vegas. Smith asked the CW if he could stay at her house and spend a few weeks with their son before leaving for the mainland. The CW consented because she thought it would be good for her son and Smith to spend time together. After breaking up with Smith, the CW had become romantically involved with M.B., a co-worker who was separated from his wife. The CW, however, had stopped seeing M.B. by the time Smith asked to stay with her.

Before Smith joined the CW on Maui, they talked about possibly reconciling. The CW considered resuming her relationship with Smith for the sake of their son but did not commit to reconciling. Instead, she told Smith that they should wait to see how things developed after they each relocated to the mainland. Nevertheless, Smith and the CW were sexually intimate while he stayed with her.

### 2. The Physical Assaults

On June 25, 1999, the CW attended an evening party hosted by her employer. Smith remained at home to watch their son, who was then about two-and-one-half years

old. The CW's roommate was away for the weekend.

M.B. was at the party, and the CW was happy to see him. At one point, the CW and M.B. left the party for about forty-five minutes and engaged in sexual intercourse in M.B.'s truck. The CW was not using birth control pills. She asked M.B. not to ejaculate inside of her and he complied. The CW did not experience any pain during her sexual encounter with M.B. The CW returned to the party with M.B. and helped other employees clean up before leaving around midnight.

The CW arrived home sometime after midnight and was greeted by her son. This concerned the CW since her son's normal bedtime was 9:00 p.m. The CW and her son went to the living room and sat on the couch. Smith stood in front of the CW and asked her about their situation and whether they were going to get back together. The CW told Smith that she still planned to go to Las Vegas and that she and Smith could talk after he got settled in Arizona.

Without warning, Smith began punching the CW. He accused the CW of being selfish and hurting him. To get away from Smith's assault, the CW ran toward her roommate's room, planning to lock the door and use her roommate's telephone. Smith tackled her from behind in the hallway. The CW felt herself being hit repeatedly by Smith's fists in her face and body as she lay on the floor and tried to shield herself from his blows. The beating in the hallway lasted five to ten minutes.

Smith grabbed the CW by the hair and dragged her down the hallway into their son's bedroom. Smith continued to punch the CW in the face while their son stood, crying, behind Smith. Smith stopped his assault and told the CW that she had been cut. Smith said, "Look what you made me do. You made me cut you." The CW saw that her right leg, right arm, and thumb had been slashed. Although the CW was not sure how Smith had cut her, she saw Smith with a utility knife later that evening. Smith gave the CW a towel to soak up the blood but continued to berate her. Smith told the CW that she had hurt him internally and that he

was going to hurt her physically because that was the only kind of hurt she understood.

For the next several hours, Smith kept the CW confined in her son's room. Smith threatened to cut the CW "from ear to ear" if she tried to leave. He said he was going to kill her because she had hurt him. On one occasion, the CW tried to escape. She lunged at Smith and tried to scratch his eyes. Smith, however, was too strong and forced the CW back to the floor. He then repeatedly kicked her in the face, using roundhouse kicks from the side, while their son watched.

Smith left the room and got a large bottle of tequila. He drank from the bottle throughout the night until it was empty. At one point, Smith grabbed the CW's head and forced about a cup of tequila down her throat. The CW tried to reason with Smith, telling Smith that he was scaring their son. The son, who refused to go to the CW because her face was so bloody, eventually fell asleep, and Smith put him to bed in the room.

Throughout the night, Smith directed a constant stream of verbal abuse at the CW. He screamed that she was worthless and that their son did not need a mother. The CW's eyes were nearly swollen shut from the beatings. Smith would sit in front of the CW and demand, "Are you listening, [CW]?" He would then smack her in the head and tell her to open her eyes and look at him. The CW remained trapped in her son's room the entire night.

### 3. The Sexual Assaults

The CW testified that after the sun came up, Smith asked her if she wanted to have sex. The CW told Smith, "No, I don't want to have sex." Smith reached for the CW's pantie and tried to pull it off. When the CW begged him to stop, Smith cut off the pantie with the utility knife. Smith threatened to put the knife inside the CW and "cut [her] pussy out." Smith placed his fingers in the CW's vagina to get himself aroused. He then told the CW to turn over because she was "too fat and ugly to look at." He inserted his penis into her vagina and sexually assaulted her.

Smith left the room. When he returned, Smith told the CW that he was going to have sex with her. The CW told Smith that he just had sex with her. Smith replied, "I did? ... [N]ow I'm going to have to kill you because that's rape and I can't go to jail." Smith dipped his fingers in the tequila and then inserted them into the CW's vagina. He next got on top of the CW and put his penis in her vagina. Smith continued to sexually assault the CW despite her pleas to "please stop, please stop, you're hurting me."

The CW testified that Smith ejaculated inside of her on both occasions. Later that morning, the CW was huddled in a corner of the room with a comforter around her. Smith crawled over to the CW, put his head in her lap, wrapped his arms around her legs, and fell asleep. The CW eased herself away from Smith and ran to a neighbor's house for help. She told the neighbor that Smith had raped her. Smith ran out of the house, jumped into a car, and drove away.

### 4. The CW's Injuries and the Police Investigation

The CW was taken to the hospital where she was treated by Dr. Pedro Giron, an emergency room physician. The CW had been badly beaten. Her right eye socket and left ring finger were fractured, her eyes were severely bruised and nearly swollen shut, and there were contusions on both ears. The CW had large lacerations on her right thigh and right arm and smaller lacerations on her chin and left thumb, all of which appeared to have been made with a sharp instrument such as a knife. She remained at the hospital for four days.

Dr. Giron performed a sexual assault examination of the CW. He noted an abrasion marked by redness and swelling at the bottom of her vagina that could indicate penetration. The CW told Dr. Giron that Smith had sexually assaulted her and ejaculated in her twice. She also advised Dr. Giron, without disclosing M.B.'s name, that she had consensual sex hours before the sexual assaults with another man who did not ejaculate in her. Dr. Giron took four swabs of fluid which he thought was semen from the CW's vagina for DNA analysis.

The State introduced evidence recovered from the CW's residence, including a utility knife found beneath the son's bed, a woman's pantie that was shredded and soaked with blood, and an empty tequila bottle. It also introduced a comforter, a cloth towel, and paper towels, all stained with blood. The CW testified that she used paper towels to wipe herself after Smith's sexual assaults. Photographs showing blood and slash marks on the walls of the son's bedroom and blood on a living room couch and the hallway walls were admitted in evidence.

Smith was arrested after he turned himself in to the police at about 7:30 p.m. on June 26, 1999. Maui Police Department (MPD) Officer Robert Harley verbally warned Smith of his *Miranda* rights and Smith said he understood those rights. Officer Harley told Smith that he would not question Smith and advised Smith not to make any statements until Smith could meet with a detective at the police station. Smith asked Officer Harley why he was being arrested. When Officer Harley replied that he thought Smith knew why, Smith told Officer Harley that Smith had "beat up his wife" and "cut her up pretty bad." Officer Harley again cautioned Smith not to make any statements, and Smith said, "I'm guilty, right?"

### B. The Defense Case

Smith's main theory of defense was that the DNA analysis refuted the CW's allegation that Smith had sexually assaulted her. MPD Detective Derek Lee, the lead detective in the investigation, submitted a number of items to the Honolulu Police Department (HPD) Crime Laboratory for possible DNA analysis. The items included vaginal swabs taken from the CW at the hospital, paper towels, a comforter, a cloth towel, and articles of the CW's clothing. The analysis was eventually done in December 2000, about eighteen months after the incident.

The defense called Wayne Kimoto, an HPD criminalist, who performed the DNA analysis. Mr. Kimoto stated that because the investigation involved allegations of sexual assault, the DNA analysis was directed at extracting spermatozoa cells from the sub-

mitted items and then determining their DNA characteristics. He explained the procedures used in his analysis. He took a sample from one of the vaginal swabs and samples from other items that appeared to contain seminal fluid. He subjected the samples to a chemical test that, if positive, would indicate the presumptive presence of seminal fluid, and then he ran additional tests on the presumptively positive samples to confirm the presence of seminal fluid. The presumptively positive samples were further processed to extract and separate out any spermatozoa cells. The extraction process involved separating cells from each sample into two fractions, with fraction 1 containing the non-spermatozoa cells and fraction 2 containing the spermatozoa cells. The known DNA genetic markers for Smith, the CW, and M.B. were then compared against any DNA genetic markers found in fraction 1 and fraction 2 of the samples.

Samples taken from a number of the submitted items, including the vaginal swab, a paper towel, and the comforter, tested presumptively positive for seminal fluid. None of these samples, however, could be confirmed as seminal fluid by subsequent tests. These samples were processed into fractions 1 and 2. In fraction 2 of the vaginal sample, the fraction designed to isolate spermatozoa cells, there was insufficient DNA from which to make a comparison. The DNA analysis of the vaginal sample was therefore inconclusive as to whether Smith had been a contributor. Fraction 2 of samples taken from the paper towel and the comforter contained genetic markers which matched Smith's genetic markers such that he could not be excluded as a DNA contributor.

Mr. Kimoto testified that only a very minute amount of DNA is needed to analyze the DNA. He identified several possible reasons why fraction 2 of a vaginal sample from a sexual assault victim may not have sufficient DNA for an analysis. These included the absence of spermatozoa or sperm DNA, the failure of the physician to take a proper sample, the perpetrator having a vasectomy or a low sperm count, or "technical artifacts," such as degradation of the DNA due to improper storage of the sample. No evidence was offered on whether Smith had a vasectomy or low sperm count or which showed that the vaginal sample had been improperly collected or stored.

## DISCUSSION

### A. The State Produced Sufficient Evidence to Support Smith's Sexual Assault Convictions.

■ Smith was convicted of four counts of sexual assault in the first degree. Two counts were based on Smith's penetration of the CW's vagina with his penis and two counts were based on penetration with his fingers. Smith argues that there was insufficient evidence for the jury to have convicted him of the sexual assaults. We disagree.

■ In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. *State v. Tamura*, 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." *State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting *State v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). Even if it could be said that the conviction is against the weight of the evidence, the conviction will nevertheless be affirmed as long as there is substantial evidence to support it. *Tamura*, 63 Haw. at 637, 633 P.2d at 1117.

■ " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241 (quoting *State v. Eastman*, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)). Sufficient evidence to support a conviction can be established through the testimony of a single witness. *Eastman*, 81 Hawai'i at 141, 913 P.2d at 67. It is the province of the jury, not the appellate courts, to determine the credibility of witnesses and the weight of the evidence. *Tamura*, 63 Haw. at 637–38, 633 P.2d at 1117; *State v. Aki*, 102 Hawai'i 457, 460, 464, 77 P.3d 948, 951, 955 (App.), *cert. denied*, 102 Hawai'i 526, 78 P.3d 339 (2003).

The State produced sufficient evidence to support Smith's sexual assault convictions.

The CW testified that after Smith brutally beat her, cut her with a utility knife, and threatened to kill her, he sexually assaulted her. The CW described two separate attacks during which Smith inserted his fingers and then his penis into her vagina. The CW's testimony alone was sufficient to support the sexual assault convictions. *Eastman*, 81 Hawai'i at 141, 913 P.2d at 67.

The State also introduced evidence corroborating the CW's testimony. This included the utility knife and shredded pantie recovered from the son's bedroom and the emergency room doctor's testimony that the CW had an abrasion at the bottom of her vagina that could indicate penetration. In addition, the State introduced evidence of the CW's substantial injuries, including photographs showing the CW's battered face and lacerations to her leg, arm, chin, and thumb.

■ Smith's insufficiency of the evidence argument is based on the lack of DNA evidence showing that he had sexual intercourse with the CW. The CW testified that Smith twice ejaculated in her. However, the DNA analysis of fraction 2 of a vaginal sample taken from the CW was inconclusive because there was insufficient DNA from the sample to perform an analysis.

Smith argues that if he had sexual intercourse with the CW and ejaculated in her as the CW alleged, the vaginal sample would have contained DNA from his spermatozoa. Smith claims that given the absence of his DNA in the vaginal sample, no reasonable jury could have found sufficient evidence to convict him of the sexual assaults.[2]

The same arguments Smith raises on appeal were argued by Smith's trial counsel to the jury. The jury rejected these arguments in convicting Smith. Smith, in essence, is asking us to overturn the jury's assessment of the weight and credibility to be given to the CW's testimony and the DNA evidence. We are not at liberty to do so. Such assessments are for the jury and not the appellate courts. *Tamura*, 63 Haw. at 637–38, 633 P.2d at 1117; *Aki*, 102 Hawai'i at 460, 464, 77 P.3d at 951, 955.

■ We also find unpersuasive Smith's suggestion that the absence of his fingerprints on the utility knife and the tequila bottle support his insufficiency of evidence claim. An MPD evidence specialist testified that a person may touch an object without leaving recoverable fingerprints. Therefore, the fact that Smith's fingerprints were not recovered from the utility knife or tequila bottle does not mean he did not touch them. Moreover, Smith's trial counsel did not dispute that Smith had cut the CW with the utility knife (he only argued the cuts were accidental), and the State introduced Smith's post-arrest statement that he had "cut her [the CW] up pretty bad."

■ Smith's trial counsel knew that the fingerprints found on the utility knife and tequila bottle did not match Smith's fingerprints. Smith, however, claims that the State "withheld" exculpatory evidence by not attempting to match these fingerprints to other people. We reject this claim. There is a distinction between failing to disclose evidence that has been developed and failing to develop evidence in the first instance. *People v. Stephens*, 58 Mich.App. 701, 228 N.W.2d 527, 529–30 (1975). The failure to develop evidence does not constitute the withholding of exculpatory evidence. *Id.* Smith's rights were not violated by the decision of the police not to pursue identification of the fingerprints. *Id.*

**B. The State's Questioning of an Evidence Specialist Was Not an Impermissible Comment on Smith's Exercise of His Right to Remain Silent.**

**1. Background Facts**

Part of Smith's theory of defense at trial was that he did not intentionally cut the CW

[2]. The State of Hawaii (the State) counters that the DNA analysis of the paper towel and the comforter corroborated the testimony of the complaining witness (the CW) that Defendant–Appellant Scott Brian Smith (Smith) had sexually assaulted her. The CW testified that she used paper towels to wipe herself after Smith had sex with her, and that she wrapped the comforter around herself after the sexual assaults. Wayne Kimoto testified that samples from the paper towel and the comforter had tested presumptively positive for seminal fluid. In fraction 2 of these samples, the fraction designed to isolate spermatozoa cells, Smith could not be excluded as a potential DNA contributor, signifying that the genetic markers from Smith's DNA matched those of the DNA found in the samples.

with the utility knife. In his opening statement, Smith's counsel indicated the evidence would show that the CW had grabbed the knife and that the CW sustained cuts when Smith and the CW struggled over the knife. Through his questioning at trial, Smith's counsel insinuated that the CW had fought back against Smith in an aggressive manner. Consistent with this theory, Smith's counsel suggested in his cross-examination of Vince Souki, an MPD evidence specialist, that a photograph Mr. Souki took of Smith's right hand after his arrest showed bite marks.

Q. You photographed the fingers of the defendant?

A. Yes, I did.

Q. Specifically, you photographed the right small or pinky finger?

A. Yes, I did.

Q. Now, I'm going to show you Exhibit 95. . . .

. . . .

Q. Will you identify 95?

A. This is the defendant's right hand, his pinkie, the exterior surface of the pinkie finger, and what I noticed when I was photographing him was an abrasion on his finger.

Q. It kind of looked like a bite marks; didn't it? Looked like teeth marks?

A. I didn't recognize it at the time as teeth marks.

Q. Take a look at it now. Look like teeth marks to you, Officer?

A. That I don't know. I'm not able to make that determination.

Smith's counsel then published the photograph, State's Exhibit 95, to the jury.

On redirect examination, the Deputy Prosecuting Attorney (DPA) asked Mr. Souki the following question and received the following response:

Q. With regard to State's Exhibit 95 and what [Smith's counsel] says appears to be teeth marks, did the defendant at any time during the taking of these photographs attribute any single one of what appeared to be injuries to [the CW]?

A. He made no statement to me at all.

Smith's counsel did not object to the DPA's question or Mr. Souki's response.[3] However, after the examination of Mr. Souki was completed, the trial judge called both counsel to side bar. The judge noted that while he felt the DPA's question to Mr. Souki was "okay," he cautioned the DPA against commenting on Smith's right to remain silent.

The Court: I'm a little concerned about comments about did the defendant say anything. I think he has a right to remain silent. He doesn't have to talk to anybody. You commenting on his silence, just a caution.

DPA: Thank you, your Honor.

The Court: It think it's okay, but you probably better be careful.

DPA: Thank you, I will.

After the judge's remarks, Smith's counsel did not move to strike Mr. Souki's answer to the DPA's question nor seek any other remedy.

### 2. Discussion

Where a defendant has been advised of his *Miranda* rights, the prosecution is prohibited from commenting on the defendant's subsequent exercise of his right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On appeal, Smith argues that the DPA's questioning of Mr. Souki was an impermissible comment on Smith's exercise of his right to remain silent. We disagree.

Because Smith did not object below, we review for plain error. Under the plain error standard of review, the appellate courts may act "to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve

---

**3.** Photographs depicting marks on Smith's body, including the abrasion on his pinkie finger, were introduced in evidence. Thus, the jury could determine for itself whether the abrasion on Smith's pinkie finger were bite marks and could assess the other marks, which appeared to be scratch marks, on his body. Mr. Souki testified that he did not know how Smith was injured or how Smith got any of the marks on his body. Smith's injuries were minor when compared to the CW's injuries and had no bearing on whether Smith had sexually assaulted the CW.

the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks and citations omitted).

> [An appellate] court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*Id.* (quoting *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

In *State v. Padilla*, 57 Haw. 150, 158, 552 P.2d 357, 362 (1976), the Hawai'i Supreme Court established the standard for determining whether the prosecution had impermissibly commented on the defendant's failure to testify at trial. The court held that the test is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* (internal quotation marks and citation omitted). We conclude that this same test applies in determining whether questioning by the prosecution constituted an impermissible comment on a defendant's exercise of his right to remain silent after being arrested and advised of his *Miranda* rights. *United States v. Vera*, 701 F.2d 1349, 1362 (11th Cir.1983).

The challenged exchange between the DPA and Mr. Souki was not manifestly intended by the DPA nor naturally and necessarily interpreted by the jury as a comment on Smith's exercise of his right to remain silent. The evidence showed that Smith was arrested at about 7:30 p.m. by Officer Robert Harley who advised Smith of his *Miranda* rights. Smith did not assert his right to remain silent and made statements to Officer Harley. After Smith was taken to the police station, he was again advised of his *Miranda* rights by the lead detective, Derek Lee. Smith signed a written waiver of his *Mi-*

*randa* rights at 8:44 p.m., and willingly answered Detective Lee's questions during an interview which lasted about an hour and forty minutes. Mr. Souki was not present at Detective Lee's interview of Smith.

After Detective Lee's interview was concluded, Mr. Souki photographed Smith at about 11:00 p.m. As an evidence specialist, Mr. Souki's role in the investigation was not to question Smith but to gather physical evidence, including taking photographs of Smith that would depict any injuries. There was no evidence that Mr. Souki ever questioned Smith.

Placed in its proper context, the DPA's question—"[D]id the defendant . . . attribute any . . . [apparent] . . . injuries to [the CW]?"—was not an attempt to elicit evidence that Smith had exercised his right to remain silent. A negative response, which the DPA presumably expected, would only have meant that Smith did not attribute any of his injuries to the CW; it would not have meant that Smith had exercised his right to remain silent. Because there was no evidence that Mr. Souki had ever questioned Smith, the DPA's question was reasonably construed by the jury as asking whether Smith had spontaneously attributed any of his injuries to the CW. The jury's natural interpretation of Mr. Souki's response that Smith "made no statement to me at all" would simply be that Smith did not speak to Mr. Souki. The jury would not have interpreted Mr. Souki's response as meaning that Smith had refused to answer questions or invoked his right to remain silent. This is especially true given the undisputed evidence that Smith had waived his *Miranda* rights, willingly answered questions by Detective Lee, and been cooperative before being photographed by Mr. Souki. We conclude that the State did not comment on Smith's exercise of his right to remain silent.[4]

## C. The CW's Testimony That She Wore a Religious Necklace Did Not Deprive Smith of a Fair Trial.

During its direct examination of the CW, the State sought to introduce the articles of

---

**4.** We agree with the State that the exchange between the Deputy Prosecuting Attorney (DPA) and Mr. Souki cannot possibly be construed as a comment on Smith's exercise of his right not to testify at trial. Whether Smith made any statement to Mr. Souki about what caused Smith's injuries after he was arrested had nothing to do with Smith's decision not to testify at trial.

clothing she was wearing at the time of the alleged sexual assaults. A dress and slip that were stained with blood and a religious necklace were obtained from the CW at the hospital. The CW identified the dress and slip, but she was unable to say whether the slip was in the same condition as when it was taken from her at the hospital. After the dress and slip were admitted into evidence, the following questioning took place.

Q. Was there any blood on this dress before you got home from the party on June 26th, 1999?

A. No.

Q. Okay. This is your dress?

A. Yes.

Q. What is this?

A. It's a scrapula [sic] [5]

Q. A what?

A. A scrapula [sic]. It's a religious necklace.

Q. Were you wearing this at that time?

A. It was tucked inside of my, my dress, my slip.

Q. Were you wearing this during the entire course of events that you described for the jury?

A. Yes.

Q. How often at that time did you wear this religious article?

A. Daily. I made it a point to wear it daily.

Q. Why did you wear it?

[Smith's counsel]: Objection, that's not relevant.

The Court: Sustained.

■ Smith argues that he was deprived of a fair trial because the prosecution improperly used religion to bolster the CW's testimony. Smith cites Rule 610 of the Hawaii Rules of Evidence (HRE), which provides that:

Evidence of beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced.

Smith contends that the trial court committed plain error in permitting the State to question the CW about her religious necklace prior to his counsel's objection. We disagree.

The State did not elicit evidence of the CW's "beliefs or opinions ... on matters of religion" in violation of HRE Rule 610. Before the objection of Smith's counsel, the DPA's questions regarding the religious necklace were relevant to showing the CW's ability to positively identify the items she was wearing during Smith's alleged assaults. The necklace was among the articles of clothing taken from the CW at the hospital. The CW's testimony that she wore the necklace under the dress and slip during Smith's alleged assaults and her ability to identify the necklace because "she made it a point to wear it daily" served to support her identification of the dress and slip.

The State's inquiry as to *why* the CW wore the religious necklace is a different matter. We are unable to discern the relevance of that question. However, Smith's objection to the question was sustained and, as a result, there was no violation of HRE Rule 610.

In any event, the State's questioning the CW about the religious necklace could not have affected the outcome of the case. The CW's testimony concerning the necklace was only a brief reference made during a lengthy trial. In addition, Smith's counsel was permitted to attack the CW's morals by pointing out that she was having sex with a married man, M.B., during the same period that she was having sex with Smith. Smith's counsel also vigorously challenged the CW's credibility by impeaching her with prior inconsistent statements.

**D. The Trial Judge Did Not Err in Permitting Smith's Counsel to Waive Smith's Presence During the Settling of Jury Instructions.**

■ The trial judge and counsel for both parties held conferences to settle jury instructions while Smith was not present. Smith's counsel expressly waived Smith's presence at these conferences. Smith argues

---

5. The witness is apparently referring to a "scapu- lar."

that he had a right to be present at the conferences and that the trial judge plainly erred in failing to obtain an on-the-record waiver from him.

Smith's argument is foreclosed by *State v. Samuel,* 74 Haw. 141, 154–55, 838 P.2d 1374, 1381 (1992). In *Samuel,* the Hawai'i Supreme Court held that a defendant does not have a constitutional or statutory right to attend a conference to settle jury instructions. *Id.* at 155, 838 P.2d at 1381. Therefore, whether waived or not, the defendant's absence from a conference to settle jury instructions does not implicate protected rights. *Id.* at 154, 838 P.2d at 1381. Rule 43(c)(3) of the Hawai'i Rules of Penal Procedure (HRPP) also specifically provides that "[a] defendant need not be present . . . at a conference or argument upon a question of law." In *State v. Toguchi,* 9 Haw.App. 466, 467–68, 845 P.2d 557, 558 (1993), this court concluded that a conference to settle jury instructions was a "conference upon a question law," and that the defendant's absence from such a conference did not violate his rights.[6]

### E. Smith Was Not Denied the Effective Assistance of Counsel.

Smith contends that his trial counsel provided ineffective assistance in: 1) failing to timely submit a list of trial witnesses, resulting in four witnesses being excluded from testifying; 2) "tricking" Smith out of testifying; 3) failing to investigate Smith's case, present evidence to bring out the truth, and inform Smith of a potentially meritorious defense; 4) waiving Smith's presence at a conference to settle jury instructions; and 5) failing to object to the State's comment on Smith's exercise of his right to remain silent.[7]

 We review claims of ineffective assistance of counsel to determine whether, "viewed as a whole, the assistance provided was within the range of competence demand-

ed of attorneys in criminal cases." *Dan v. State,* 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994) (internal quotation marks, citation, and brackets omitted).

> [T]he defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*Richie,* 88 Hawai'i at 39, 960 P.2d at 1247. As explained below, we conclude that Smith's claims of ineffective assistance of counsel have no merit.

#### 1. Submission of Witness Lists

 On June 1, 2001, Smith's trial counsel filed a witness list which named twenty-six people, including four members of Smith's family. Prior to jury selection on June 4, 2001, the State asked the trial judge to exclude the four Smith family members from testifying because the State had not received discovery concerning them. Smith's trial counsel did not object to the State's motion and advised the judge that he was "not going to call" the four members of Smith's family. The judge then granted the State's motion, but stated that his ruling would be subject to reevaluation based on developments during the trial. Smith's trial counsel never sought permission to call the four Smith family members during the trial.

It appears that Smith's trial counsel made a strategic decision not to call the four Smith family members as witnesses. That was the reason they were not called. Their failure to testify was not the result of the late filing of the defense witness list or the judge's order excluding them.

---

**6.** We decline Smith's invitation to extend the procedures required by *Tachibana v. State,* 79 Hawai'i 226, 900 P.2d 1293 (1995), to the waiver of the defendant's presence at a conference to settle jury instructions.

**7.** Smith also refers us to his sentencing transcript for a complete list of errors committed by

his trial counsel which Smith claims are "too numerous to list." We decline to address any issues not specifically raised by Smith in his brief. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) ("Points not argued may be deemed waived.").

The decision on whether to call a witness is normally a matter within the judgment of counsel and will rarely be second-guessed by judicial hindsight. *Richie*, 88 Hawai'i at 40, 960 P.2d at 1248. In addition, a defendant must support claims of ineffective assistance of counsel that are based on the failure to obtain witnesses by affidavits or sworn statements describing the testimony of the proffered witnesses. *Id.* at 39, 960 P.2d at 1247. Here, Smith has provided nothing to show what his four family members would have said had they been called as witnesses. Smith's claim of ineffectiveness based on the late filing of the defense witness list is rejected.

### 2. Smith's Decision Not to Testify

Smith claims that his trial counsel provided ineffective assistance in "tricking" Smith out of testifying in his own defense. The record refutes this claim. The trial judge complied with the procedures required by *Tachibana v. State*, 79 Hawai'i 226, 900 P.2d 1293 (1995), and obtained a valid on-the-record waiver by Smith of his right to testify at trial. During his colloquy with the judge, Smith stated that the decision not to testify was his own personal decision and that his trial counsel had left to Smith the decision on whether to testify.

### 3. Remaining Allegations

Smith asserts that his trial counsel did no investigation, presented no evidence that could bring out the truth, and failed to inform Smith of a potentially meritorious defense. There is no support in the record for Smith's conclusory allegations. There is no affidavit, sworn statement, or proffer of the alleged evidence or meritorious defense his trial counsel failed to uncover or present. Smith claims that his trial counsel failed to tell him about a report done by a University of Hawai'i professor concerning the State's DNA analysis. He does not, however, explain how this report would have assisted his defense.

We also reject Smith's claim that his trial counsel provided ineffective assistance in waiving his presence at the conferences to settle jury instructions and in failing to object to the State's comment on his exercise of his right to remain silent. We have already concluded that Smith had no right to be present at the conferences to settle jury instructions and that the DPA's questioning of Mr. Souki was not an impermissible comment on Smith's exercise of his right to remain silent. Smith has failed to meet his burden of proving that his trial counsel's performance was defective and that such defective performance resulted in the withdrawal or substantial impairment of a potentially meritorious defense.

### F. The Court Did Not Abuse Its Discretion in Sentencing Smith.

Smith contends that the court abused its discretion in sentencing him to extended terms of imprisonment, allowing the admission of hearsay evidence, and denying his request for a continuance of sentencing. Smith's contentions have no merit.

A sentencing judge has broad discretion in determining the severity of the appropriate punishment. *State v. Gaylord*, 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995). Where a sentence is authorized by valid statutes, its imposition is reviewed for "plain and manifest abuse of discretion." *Id.* at 144, 890 P.2d at 1184. Generally, to constitute an abuse of discretion, "it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Kumukau*, 71 Haw. 218, 227–28, 787 P.2d 682, 688 (1990).

### 1. The Court's Imposition of Consecutive Sentences Was Proper.

As the State correctly argues, Smith was not sentenced to extended terms of imprisonment on any of his convictions. Rather, the court ran the terms of imprisonment on several of Smith's convictions consecutive to each other, resulting in a total imprisonment of 45 years. Smith's arguments that the court violated the requirements for imposing an extended term of imprisonment are therefore misguided. In *State v. Sinagoga*, 81 Hawai'i 421, 430, 918 P.2d 228, 237

(App.1996), this court explained the difference between consecutive and extended term sentences:

> Consecutive sentences follow one another seriatim, one being completely served before the next is begun. They result from either conviction of multiple crimes or from conviction of additional crimes while under a prior sentence. On the other hand, the extended term authorized under the penal code to be imposed by a sentencing judge is a sentence that enlarges the ordinary sentence for any given offense. While a consecutive sentence increases the defendant's overall term of imprisonment, it does not enlarge the ordinary sentence for any given offense; a consecutive sentence only specifies how multiple sentences will be served.

(internal citations, quotation marks, and brackets omitted).

 Under HRS § 706–668.5 (1993), the court has the discretion to order multiple terms of imprisonment imposed on a defendant at the same time to run concurrently or consecutively. In making this decision, the court is obligated to consider the factors set forth in HRS § 706–606 (1993).[8] HRS § 706–668.5. There is no requirement, however, that the court expressly recite its findings on the record for each of the factors set forth in HRS § 706–606. *Sinagoga,* 81 Hawai'i at 428, 918 P.2d at 235. Absent clear evidence to the contrary, it is presumed that a sentencing court which has received a pre-sentence report and conducted the required sentencing hearing has considered all the factors set forth in HRS § 706–606 before imposing concurrent or consecutive terms of imprisonment. *Id.*

In sentencing Smith, the court stated it was "taking into consideration all of the factors set forth in Hawaii Revised Statutes Section 706–606." The court also specifically addressed a number of the HRS § 706–606 factors, including the nature and circumstances of Smith's offenses, Smith's characteristics, and the need for the sentence imposed to reflect the seriousness of the offenses, to provide just punishment, and to protect the public. Among other things, the court pointed to the high level of cruelty, violence, and viciousness involved in Smith's commission of the offenses, the fact that most of the offenses took place in front of Smith's two-year-old son, Smith's lack of remorse, the clear and present danger Smith posed to the CW and the community, and the poor prospects for Smith's rehabilitation. Based on this record, we conclude that the court did not abuse its discretion in imposing consecutive terms of imprisonment on Smith.

### 2. The Court Properly Rejected Smith's Hearsay Objection.

The CW submitted a Victim Impact Statement in the form of a letter addressed to the sentencing judge which was included in Smith's pre-sentence report. In the letter, the CW described how Smith's crimes had affected her life. At sentencing, the DPA briefly read a portion of the CW's letter to the court. Smith objected on the ground of "inadmissible hearsay" and was overruled.

 On appeal, Smith argues that the sentencing court erred in overruling his hearsay objection. Smith's argument is based on the erroneous premise that the court imposed an extended term sentence and therefore the Hawaii Rules of Evidence

---

8. Hawaii Revised Statutes (HRS) § 706–606 (1993) provides as follows:

§ 706–606 **Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:
(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed:
(a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
(b) To afford adequate deterrence to criminal conduct;
(c) To protect the public from further crimes of the defendant; and
(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available; and
(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

applied. While the rules of evidence apply to extended term sentencing, *State v. Kamae*, 56 Haw. 628, 638, 548 P.2d 632, 639 (1976), they do not apply to the "ordinary term" sentencing that Smith received. HRE Rule 1101(d)(3). Thus, the court properly overruled Smith's hearsay objection.[9]

### 3. The Court Did Not Abuse Its Discretion in Denying Smith's Request for a Continuance.

■ The jury returned its guilty verdicts on June 20, 2001. Smith's sentencing was originally set for August 16, 2001. It did not, however, take place until November 20, 2002. In the meantime, the court accommodated Smith's repeated requests for new counsel, substituting Richard Gronna for Smith's trial counsel in August of 2001, and James Brumbaugh for Mr. Gronna in February of 2002. In March of 2002, Mr. Brumbaugh filed a motion to withdraw, but agreed to remain as counsel after Smith indicated he could work with Mr. Brumbaugh and would be prepared for sentencing. In April of 2002, the court granted Smith's request to obtain transcripts of the trial. The court approved several stipulations to continue sentencing to give Smith's counsel time to prepare.

On September 11, 2002, Mr. Brumbaugh filed another motion to withdraw, citing, among other things, Smith's plans to hire new counsel. Sentencing was continued from September 24, 2002, to November 14, 2002. On November 14, 2002, Mr. Shawn Luiz appeared at the scheduled sentencing to represent Smith. Mr. Luiz stated that he was not prepared and made an oral motion to continue Smith's sentencing. The court granted the motion and continued sentencing to November 20, 2002, but it refused to allow Mr. Brumbaugh to withdraw as Smith's counsel. The court warned Smith that sentencing would proceed on November 20, 2002. The court stated that Mr. Luiz could represent Smith if Mr. Luiz was ready, but otherwise sentencing would proceed with Mr. Brumbaugh as Smith's counsel. Mr. Luiz then requested a 90-day continuance which the court denied.

On November 20, 2002, both Mr. Luiz and Mr. Brumbaugh appeared on Smith's behalf at sentencing. Mr. Luiz again asked for a continuance of 90 to 120 days. The court denied that request. The court noted that Smith had changed lawyers several times, that Smith had indicated he would be ready for sentencing with Mr. Brumbaugh as his counsel at a prior hearing, and that Smith at one point had delayed matters by apparently directing his brother not to turn over files to Smith's lawyer. The court found that Smith had engaged in dilatory conduct and that his last minute change of counsel was just a subterfuge to delay sentencing. The court proceeded with sentencing and permitted both Mr. Luiz and Mr. Brumbaugh to argue on Smith's behalf.

We reject Smith's contention that the court abused its discretion in failing to grant a longer continuance to permit his new counsel to prepare for sentencing. *See State v. Pulse*, 83 Hawai'i 229, 239, 925 P.2d 797, 807 (1996) (holding that the denial of a trial continuance is reviewed for abuse of discretion). The court gave Smith ample time to secure counsel who would be prepared for sentencing and accommodated Smith by continuing his sentencing several times. Smith bears the responsibility for any deficiency in the ability of his new counsel to prepare. The court did not abuse its discretion in refusing to further delay Smith's sentencing.

### III. CONCLUSION

We affirm the November 20, 2002 Judgment entered by the Circuit Court of the Second Circuit.

---

9. Smith did not claim in the court below and does not claim on appeal that the CW's Victim

Impact Statement was inaccurate.